**UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,**

**v.**

**HAYTER OIL COMPANY, INC. OF GREENEVILLE, TENNESSEE, d/b/a Marsh Petroleum Company, and Sonny Wayne Marsh, Defendants–Appellees, Cross–Appellants.**

**Nos. 94–5670, 94–5712 and 94–5713.**

United States Court of Appeals, Sixth Circuit.

Argued March 23, 1995.

Decided April 17, 1995.

John J. Powers, III, John P. Fonte (argued and briefed), U.S. Dept. of Justice, Antitrust Div., Washington, DC, William D. Dillon, William G. Traynor, U.S. Dept. of Justice, Antitrust Div., Atlanta, GA, for U.S.

Frank A. Johnstone (argued and briefed), Wilson, Worley, Gamble & Ward, Kingsport, TN, Roger W. Dickson, Miller & Martin, Chattanooga, TN, E.C. Heininger (briefed), Greeneville, TN, for Hayter Oil Co., Inc. of Greeneville, Tenn., dba Marsh Petroleum Co.

Frank A. Johnstone, Wilson, Worley, Gamble & Ward, Kingsport, TN, John T. Milburn, Rogers, Rogers, Laughlin, Nunnally & Hood, E.C. Heininger, Greeneville, TN, for Sonny Wayne Marsh.

Before: MILBURN and NORRIS, Circuit Judges; MILES,* District Judge.

MILBURN, Circuit Judge.

In this case of first impression, the United States of America appeals the sentences imposed on defendant Hayter Oil Co., Inc. and defendant Sonny Wayne Marsh following their jury convictions for conspiracy to fix gasoline prices in violation of the Sherman Act, 15 U.S.C. § 1. Defendants cross-appeal the underlying jury convictions. On appeal, the issues are (1) whether the district court erroneously interpreted the Antitrust Guideline, United States Sentencing Guideline ("U.S.S.G.") § 2R1.1, and (2) whether the evidence was sufficient to prove that defendants were participants in a conspiracy that existed within the five-year statute of limitations. For the reasons that follow, we affirm in part and reverse in part.

## I.

### A.

This case arises out of a conspiracy to control retail gasoline prices in the Greeneville, Tennessee, area between 1984 and 1989 in violation of the Sherman Act. At the time, there were over 50 retail gasoline outlets and at least ten gasoline distributors in the Greeneville market. However, the market

* The Honorable Wendell A. Miles, United States District Judge for the Western District of Michigan, sitting by designation.

was controlled during the period of the conspiracy by a small group of dealers or "jobbers" who purchased gasoline at the pipeline terminal in Knoxville, Tennessee, transported it to Greeneville, and sold it through their own retail outlets or to owners of other retail outlets. Among those involved in the conspiracy were defendant Hayter Oil Company, Inc. of Greeneville, Tennessee, doing business as Marsh Petroleum Company ("Hayter Oil"), and its president, defendant Sonny Wayne Marsh.

The retail price-fixing conspiracy began after Robert Leonard, a Johnson City, Tennessee-based dealer, opened a new gas station in Greeneville in May 1984. Leonard decided that when he opened his new location he would meet the lowest price in town, which at the time was at a gas station owned and operated by Pilot Oil Company ("Pilot"). As a result, a price war erupted that drove retail gasoline prices down. In June 1984, the primary competitors in the Greeneville market held a meeting at a truck stop to discuss the low prices. At the meeting, the dealers, including defendant Marsh, discussed how they could raise the retail gasoline prices and agreed to support each other with a price increase. Because Pilot was a large corporation with national operations, the dealers did not believe they could approach it with their price-fixing scheme. They viewed Pilot as a potential problem because if Pilot did not raise its pump prices in response to their price increase, the gas stations located near Pilot would be pressured to meet Pilot's lower prices. Nevertheless, the dealers chose to ignore Pilot and agreed to raise their pump prices by three to four cents per gallon. When the dealers left the meeting, as Leonard explained, "we had the deal to fix the prices." J.A. 223.

Although gasoline prices initially went up as agreed following the meeting, they gradually decreased. As a result, the dealers had several subsequent meetings to shore up prices that had eroded as a result of dealers cheating or reducing their prices in response to Pilot's lower prices. A few months after the meeting at the truck stop, the dealers met at the home of John Thomas, who owned 30% of Hayter Oil (which at the time was doing business as Marsh & Thomas Petroleum) until he sold his share to defendant Marsh in September 1987, which made defendant Marsh the sole owner. At this meeting, all the dealers "agreed that the price was too cheap," and "it was understood that the price was going to increase the first part of the week." J.A. 182–83. The prices moved up on Monday or Tuesday of the following week. About a month later, the dealers met again at Thomas' home and agreed to make another effort to increase the prices. There was another meeting at a cafeteria, at which the dealers did not discuss any details about the gasoline prices because they were in an open room with too many other people walking in and out of the room.

In 1985, the dealers stopped having group meetings and began using telephone calls and one-on-one meetings to coordinate price increases. The dealers continued with their price-fixing activity "all of the way through the biggest part of '88." J.A. 255. Once grand jury subpoenas relating to a price-fixing conspiracy in Johnson City were issued on January 4, 1989, the telephone calls and meetings about price fixing in Greeneville stopped. According to Leonard, no one in east Tennessee continued to fix the gasoline prices after that date. During this period, the typical price increase in the Greeneville market was between two and seven cents per gallon and would last anywhere from a day or two to several weeks before starting to drop.

Either defendant Marsh or Thomas attended all the group meetings that were held during 1984. Leonard testified that between 1984 and 1988, he had several one-on-one meetings and had frequent telephone conversations with defendant Marsh to discuss gasoline prices. Similarly, between 1984 and 1988, Warren Broyles talked with either defendant Marsh or Thomas at least 30 to 35 times to discuss and agree on retail gasoline prices. Defendant Marsh also talked to another dealer, J. Fred Meyers, about gasoline prices on numerous occasions. At times, Marsh would drop the prices at two small gas stations he owned in Jonesboro, Tennessee, in order "to get [Leonard's] attention to get the Greeneville market to go back up,"

because Leonard also owned a large volume gas station in Jonesboro. J.A. 269–70.

B.

On July 21, 1993, a federal grand jury returned a one-count indictment against defendant Hayter Oil Company, Inc. of Greeneville, Tennessee, doing business as Marsh Petroleum Company, and its president, defendant Sonny Wayne Marsh. The indictment charged that beginning as early as 1984 and continuing through the end of 1988, defendants engaged in a conspiracy to fix, raise, and maintain the retail prices of gasoline sold in the Greeneville, Tennessee, area in violation of the Sherman Act, 15 U.S.C. § 1.

This case was tried before a jury, which convicted both defendants. After denying defendants' renewed motions for a judgment of acquittal or, in the alternative, a new trial, the district court sentenced both defendants pursuant to the Antitrust Guideline, U.S.S.G. § 2R1.1.[1] The district court began by instructing counsel that it intended to impose sentences consistent with the fine it had imposed in an earlier case against Appalachian Oil Company for conspiring to fix retail gasoline prices in the Johnson City market. *See United States v. Appalachian Oil Co.,* No. 2:91–CR–78, 1993 WL 773572 (E.D. Tenn. Nov. 18, 1993). In *Appalachian Oil,* the district court based the fine on sales made only during periods when the conspiracy was generally successful in raising or maintaining prices. *Id.* slip op. at 4–5. Accordingly, defendant Hayter Oil's counsel argued that because the "conspiracy to set prices was relatively ineffective, was sporadic, [and] was not honored at times by all those who were supposed to be in the conspiracy," the conspiracy was effective only 40 weeks, "at the outside," out of the entire conspiracy period. J.A. 297, 298. The government responded that under the Antitrust Guideline, the volume of commerce is the defendant's total sales of the commodity at issue during the duration of the conspiracy. The government also submitted an affidavit of Leonard stating that "there was never a substantial period of time when retail prices of gasoline sold at stations in the area were not affected by the agreement between jobbers." Affidavit of Robert Leonard (quoted in Appellant's Brief at 9).

In the district court's memorandum opinion, it recognized that evidence on the effectiveness of a conspiracy is irrelevant in determining guilt but stated that it is required at sentencing. Thus, it concluded that the "volume of commerce" referred to in the Antitrust Guideline consists only of sales made during those periods that the government demonstrated that the conspiracy was "in effect." Presumably, because the district court intended to impose fines consistent with those in *Appalachian Oil,* it deemed a conspiracy to be in effect for sentencing purposes only when it was successful in raising or maintaining prices.

1. The 1988 version of the Antitrust Guideline, U.S.S.G. § 2R1.1, entitled "Bid–Rigging, Price–Fixing or Market–Allocation Agreements Among Competitors," provides:

(a) Base Offense Level: 9

(b) Specific Offense Characteristics

(1) If the conduct involved participation in an agreement to submit noncompetitive bids, increase by 1 level.

(2) If the volume of commerce attributable to the defendant was less than $1,000,000 or more than $4,000,000, adjust the offense level as follows:

| | *Volume of Commerce* | *Adjustment of Offense Level* |
|---|---|---|
| (A) | less than $1,000,000 | subtract 1 |
| (B) | $1,000,000-$4,000,000 | no adjustment |
| (C) | $4,000,001-$15,000,000 | add 1 |
| (D) | $15,000,001-$50,000,000 | add 2 |
| (E) | over $50,000,000 | add 3. |

For purposes of this guideline, the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation. When multiple counts or conspiracies are involved, the volume of commerce should be treated cumulatively to determine a single, combined offense level.

(c) Fines

A fine shall be imposed in addition to any term of imprisonment. The guideline fine range for an individual conspirator is from 4 to 10 percent of the volume of commerce, but not less than $20,000. The fine range for an organization is from 20 to 50 percent of the volume of commerce, but not less than $100,000.

The district court found that the price-fixing activities were in effect only 40 weeks over the entire conspiracy period of 234 weeks, which is 17.094% of the time. Thus, the district court concluded that the affected volume of commerce for purposes of the Antitrust Guideline was $723,398, which is 17% of the $4.231 million of gasoline sold by defendant Hayter Oil during the conspiracy period. The fines the district court imposed were consistent with this volume of commerce calculation—$50,000 for defendant Marsh and $289,359 for defendant Hayter Oil.[2] This appeal by the government and cross-appeal by defendants followed.

## II.

The government appeals the district court's interpretation of the Antitrust Guideline, U.S.S.G. § 2R1.1, and the resulting fine. We have jurisdiction over the government's appeal pursuant to 18 U.S.C. §§ 3731 and 3742(b). Defendants cross-appeal challenging the sufficiency of evidence. We have jurisdiction over defendants' cross-appeal pursuant to 28 U.S.C. § 1291. We shall address defendants' argument on cross-appeal first because it challenges the convictions.

### A.

Defendants argue in their cross-appeal that the evidence was insufficient to support their convictions for a violation of the Sherman Act, 15 U.S.C. § 1. Specifically, defendants argue (1) that the guilty plea of another gasoline dealer and a related Rule 11 (Federal Rule of Criminal Procedure 11) memorandum should not have been considered as evidence of defendants' guilt, and (2) that the evidence was insufficient to prove that defendants were participants in a conspiracy that existed within the five-year statute of limitations.

#### (1)

On July 19, 1993, in a related case, Greeneville Oil Company and its secretary-treasurer, J. Fred Meyers, pled guilty to conspiring to fix prices in the Greeneville, Tennessee, area between 1984 and 1988. At the trial of this case, the government called Allen Johnson, a vice president of Greeneville Oil Company, to testify about this guilty plea.[3] The government introduced the guilty plea and a supporting Rule 11 memorandum, which stated that "[a]greements regarding retail gasoline prices were reached with agents for Hayter Oil Company, Inc. of Greeneville, Tennessee d/b/a Marsh Petroleum Company. . . ." Government Exhibit 27 at 3–4 (quoted in Appellees' Brief at 11–12).

Defendants argue that the introduction of the guilty plea and the memorandum violated their rights under the Confrontation Clause of the Sixth Amendment to the Constitution of the United States. This argument was not raised at trial. On appeal, defendants do nothing more than make the conclusory assertion that their rights under the Confrontation Clause were violated, and they make no attempt to show how they were prejudiced, if at all, by the admission of the guilty plea and supporting memorandum. Accordingly, we need not address this issue further as it has been waived. *See United States v. Tracy,* 989 F.2d 1279, 1286 (1st Cir.) (stating that "issues are deemed waived when 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation' "), *cert. denied,* — U.S. —, 113 S.Ct. 2393, 124 L.Ed.2d 294 (1993); *see also United States v. Phibbs,* 999 F.2d 1053, 1080 n. 12 (6th Cir.1993) (noting that "it is not our function to craft an appellant's arguments"), *cert. denied,* — U.S. —, 114 S.Ct. 1070, 127 L.Ed.2d 389 *and* — U.S. —, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994).

Defendants also state, and the government agrees, that because plea agreements and Rule 11 memoranda are not admissible as evidence of the defendants' guilt but are admissible only as evidence of a witness' credibility, they should not be considered in determining the sufficiency of the evidence. Defendants' argument misses the point because the plea agreement and the Rule 11 memorandum in this case were admitted only to show how they might have

2. In addition to the fines imposed, each defendant was sentenced to four years probation.

3. Meyers was not available to testify because he was hospitalized at the time of trial.

affected a witness' testimony. The district court instructed the jury, both when the evidence was introduced and at the end of the trial, that this evidence was only admissible for the purpose of determining witness credibility.[4] "Where jurors are so instructed, courts presume that the jurors understood and followed the directions given." *United States v. Sivils,* 960 F.2d 587, 594 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 130, 121 L.Ed.2d 84 (1992). Therefore, this argument is rejected.

(2)

The indictment in this case was returned on July 21, 1993. Thus, pursuant to the relevant statute of limitations, 18 U.S.C. § 3282, which imposes a five-year statute of limitations, the government was required to prove that the conspiracy continued after July 21, 1988. Defendants argue that the evidence was insufficient to prove that a conspiracy continued after July 21, 1988, and therefore the action should be barred by the statute of limitations.

"A defendant claiming 'insufficiency of the evidence bears a very heavy burden.'" *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.) (quoting *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). In reviewing the sufficiency of the evidence in support of a criminal conviction, we must determine "whether the relevant evidence could be accepted by a reasonably minded jury as adequate and sufficient to support the conclusion of guilt beyond a reasonable doubt." *United States v. Cooperative Theatres of Ohio, Inc.,* 845 F.2d 1367, 1373 (6th Cir.1988) (per curiam) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)); *see also United States v. Vincent,* 20 F.3d 229, 232–33 (6th Cir.1994); *United States v. Peters,* 15 F.3d 540, 544 (6th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 219, 130 L.Ed.2d 146 (1994). "The evidence is to be viewed in the light most favorable to the government." *Cooperative Theatres,* 845 F.2d at 1373; *see also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Payne,* 962 F.2d 1228, 1235 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 306, 121 L.Ed.2d 229 *and* — U.S. —, 113 S.Ct. 811, 121 L.Ed.2d 684 (1992). "Moreover, every reasonable inference from the evidence must be drawn in the government's favor." *Cooperative Theatres,* 845 F.2d at 1373; *see also United States v. Adamo,* 742 F.2d 927, 932 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985).

Proof of an overt act is not required to establish a violation of § 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845–46 n. 59, 84 L.Ed. 1129 (1940) (citing *Nash v. United States,* 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913)). Because the price-fixing agreement itself constitutes the crime, the government is only required to prove that the agreement existed during the statute of limitations period and that the defendant knowingly entered into that agreement. *Socony-Vacuum,* 310 U.S. at 223–24 & n. 59, 60 S.Ct. at 844–46 & n. 59 ; *Cooperative Theatres,* 845 F.2d at 1373; *cf. Grunewald v. United States,* 353 U.S. 391, 396–97, 77 S.Ct. 963, 969–70, 1 L.Ed.2d 931 (1957) (requiring proof of an overt act to establish that a conspiracy was in existence where the conspiracy itself requires proof of an overt act); *United States v. Lash,* 937 F.2d 1077, 1081 (6th Cir.1991) (same), *cert. denied,* 502 U.S. 949, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991) *and* 502 U.S. 1061, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992). Proof of an overt act taken in furtherance of the conspiracy within the statute of limitations period would clearly demonstrate the continued existence of the conspiracy. *See Grunewald,* 353 U.S. at 396–97, 77 S.Ct. at 969–70; *Lash,* 937 F.2d at 1081. However, once a conspiracy has been established, it is presumed to continue until there is an affirma-

4. When the evidence was initially introduced, the jury was instructed that the plea agreement was being introduced only "to show what the plea agreement was ... and how it might affect this man's testimony." J.A. 146. At the end of the trial, the jury was instructed that the guilty plea may be considered "for the sole purpose of determining the believability of the witness and for no other purpose." J.A. 293.

tive showing that it has been abandoned. *United States v. Kissel,* 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910); *United States v. Hamilton,* 689 F.2d 1262, 1268 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983).

It is clear that under this standard, there is sufficient evidence to support the conclusion that the conspiracy existed within the relevant statute of limitations. The indictment in this case charged defendants with participating in a conspiracy to fix, raise, and maintain the retail prices of gasoline sold in the Greeneville, Tennessee, area between 1984 and 1988. Based on the evidence, the jury convicted defendants of that charge. Defendants do not dispute the existence of the conspiracy itself; instead, they challenge the existence of the conspiracy during the relevant statute of limitations period.

The scope and duration of the conspiracy were established primarily through the testimony of Robert Leonard and Warren Broyles, two dealers who sold gasoline in the Greeneville market. They explained that defendant Hayter Oil's participation in the conspiracy was critical to its success because of defendant Hayter Oil's influence in the Greeneville market. Leonard and Broyles both testified that they had reached agreements with defendant Marsh to raise gasoline prices on several occasions during the 1984–1988 time frame charged in the indictment. Broyles also testified that defendant Marsh sometimes supported the increases pursuant to their agreements. Additionally, there is an abundance of additional evidence in the record that the conspiracy existed during the 1984–1988 time frame.

There is also sufficient evidence in the record that the conspiracy continued past the relevant statute of limitations date of July 21, 1988. For example, Leonard testified that the regular price-fixing activity continued "all of the way through the biggest part of '88." J.A. 255. In addition, as detailed in Government's Exhibit 18, there were several telephone calls that Leonard and Broyles made to other Greeneville dealers. With regard to five telephone calls that Leonard made to Greeneville Oil Company on September 16, 1988, Leonard explained that "the only business we discussed was gasoline prices in Greeneville, Tennessee.... These was [sic] discussions about moving the gasoline prices upward." J.A. 211. As illustrated in Government's Exhibit 18, the conspirators successfully raised prices in the days prior to July 21, 1988, and maintained those prices through the end of July. Additionally, Leonard testified that the conspirators successfully raised prices on September 15, 1988, and maintained those prices through the end of September.

Defendants do not argue that they withdrew from the conspiracy prior to July 21, 1988. Withdrawal is an affirmative defense which must be proven by the defendant. *Payne,* 962 F.2d at 1234; *United States v. Battista,* 646 F.2d 237, 246 (6th Cir.), *cert. denied,* 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981). Absent proof that any conspirator has withdrawn from the conspiracy, he is liable for all acts performed in furtherance of the conspiracy by the other conspirators. *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *Lash,* 937 F.2d at 1083–84; *Adamo,* 742 F.2d at 944. Thus, the government did not need to show that defendants performed overt acts in furtherance of the conspiracy after July 21, 1988. Likewise, the absence of communications between defendant Marsh and either Broyles or Leonard does not, as defendants assert, confirm the absence of a conspiracy in the Greeneville, Tennessee, area. Because defendants did not argue that they withdrew from the conspiracy and because both Leonard and Broyles admitted involvement in the conspiracy after July 21, 1988, the jury correctly concluded that defendants were involved in the conspiracy after July 21, 1988.[5]

5. Defendant cites *United States v. Van Hee,* 531 F.2d 352 (6th Cir.1976), in support of the proposition that " '[e]vidence that at most establishes no more than a choice of reasonable probabilities cannot be said to be sufficiently substantial to sustain a criminal conviction upon appeal.' " *Id.* at 357 (quoting *United States v. Saunders,* 325 F.2d 840, 843 (6th Cir.1964), *cert. denied,* 379 U.S. 978, 85 S.Ct. 677, 13 L.Ed.2d 568 (1965)). However, on appeal, we must view the evidence

B.

The government argues in its appeal that the fine imposed on defendants by the district court was improper pursuant to the Antitrust Guideline, U.S.S.G. § 2R1.1. Specifically, the government argues that the district court improperly interpreted the "volume of commerce" upon which the fine is based to include only the sales made by defendant Hayter Oil when the conspirators successfully achieved their target prices. The government suggests that this interpretation of the Antitrust Guideline is contrary to its plain language. In addition, the government argues that the commentary to the Antitrust Guideline supports the conclusion that all of the sales made by defendant Hayter Oil during the conspiracy should be included in determining the "volume of commerce."

(1)

"Appellate review of sentences imposed pursuant to the guidelines is generally governed by 18 U.S.C. § 3742. Under section 3742, we review *de novo* a sentencing court's interpretation of the guidelines, but we must uphold a sentencing court's factual findings unless they are clearly erroneous." *United States v. Watkins,* 994 F.2d 1192, 1195 (6th Cir.1993) (citations omitted) (emphasis in original); *see United States v. Sanchez,* 928 F.2d 1450, 1458 (6th Cir.1991). "The Guidelines should be interpreted as if they were a statute ..., and we will 'follow the clear, unambiguous language if there is no manifestation of a contrary intent.'" *United States v. Lewis,* 900 F.2d 877, 881 (6th Cir.) (quoting *United States v. Goldbaum,* 879 F.2d 811, 813 (10th Cir.1989)), *cert. denied,* 498 U.S. 840, 111 S.Ct. 117, 112 L.Ed.2d 86 (1990). Therefore, our interpretation of the Antitrust Guideline begins with its plain language. *Id.; see Williams v. United States,* 503 U.S. 193, 199–201, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) (construing the plain language of the U.S.S.G.).

The 1988 version of the Antitrust Guideline, entitled "Bid-Rigging, Price-Fixing or Market-Allocation Agreements Among Competitors," provides: "The guideline fine range for an individual conspirator is from 4 to 10 percent of the volume of commerce [and] ... [t]he fine range for an organization is from 20 to 50 percent of the volume of commerce...." U.S.S.G. § 2R1.1(c). "[T]he volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation." U.S.S.G. § 2R1.1(b). It is the meaning of "volume of commerce" that we must interpret today.

The district court recognized that a price-fixing scheme is a violation of the Sherman Act even if it is not effective. *See Socony–Vacuum,* 310 U.S. at 224 n. 59, 60 S.Ct. at 845–46 n. 59. However, the district court found that the price-fixing scheme was in effect only 40 weeks out of the 234-week period of the conspiracy, which is 17.094% of the time. Thus, the district court concluded that the affected volume of commerce for purposes of the Antitrust Guideline was $723,398, or 17% of the $4.231 million of gasoline sold by defendant Hayter Oil during the conspiracy period.

In advancing their interpretations of "volume of commerce," both the government and defendants focus on the meaning of the phrase "affected by the violation." Although no court has interpreted this phrase, and commentators suggest that the phrase is ambiguous, *see* Mark A. Cohen & David T. Scheffman, *The Antitrust Sentencing Guideline: Is the Punishment Worth the Costs?,* 27 Am.Crim. L.Rev. 331, 349 (1989), we believe the meaning of this phrase can be discerned from its everyday usage. "Affect" is defined "to produce an effect ... upon" or "to have a detrimental influence on" and is synonymous with the term "influence." *Webster's Third New International Dictionary* 35 (unabridged ed.1981). The verb form of

in the light most favorable to the government. *See Cooperative Theatres,* 845 F.2d at 1373. Viewed in this light, we believe the evidence does more than merely establish a reasonable probability that defendants are guilty and certainly is sufficiently substantial to support the jury's conclusion that the conspiracy existed within the relevant statute of limitations.

"influence" is defined "to affect or alter the conduct, thought, or character of by indirect or intangible means." *Id.* at 1160. Thus, "affected" is very broad and would include all commerce that was influenced, directly or indirectly, by the price-fixing conspiracy. In theory, this would include even sales lost due to, in accordance with the normal economic principles of supply and demand, the decreased demand that accompanies higher prices. However, the Antitrust Guideline includes only that "volume of commerce" done by the defendant or his principal, which would limit the scope of the "volume of commerce" to actual sales.

Therefore, we agree with the government's conclusion that there is nothing in the language of the Antitrust Guideline that suggests that the Sentencing Commission intended that the district court "exclude from a defendant's volume of commerce sales of a product that was the direct object of a price[-]fixing agreement, because those sales were made at less than the agreed-on price." Appellant's Brief at 17. Construing the plain language of the Antitrust Guideline, we conclude that the volume of commerce attributable to a particular defendant convicted of price-fixing includes all sales of the specific types of goods or services which were made by the defendant or his principal during the period of the conspiracy, without regard to whether individual sales were made at the target price.[6] The proof in this case showed that defendants were involved in a single continuing conspiracy to fix retail gasoline prices from 1984 through nearly the end of 1988.

(2)

This interpretation is consistent with the purposes of the Sherman Act. Because they "are so 'plainly anticompetitive,' and so often 'lack ... any redeeming virtue,'" *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979) (citations omitted), price-fixing agreements have been recognized as illegal per se, *see National Soc'y of Professional Eng'rs v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365–66, 55 L.Ed.2d 637 (1978); *Socony–Vacuum,* 310 U.S. at 223–24 & n. 59, 60 S.Ct. at 844–46 & n. 59. Accordingly, they are deemed illegal "without any inquiry in individual cases as to their actual competitive effect." U.S.S.G. § 2R1.1 commentary (background). Such a rule avoids the necessity of making "a burdensome inquiry into actual market conditions" to determine when the conspiracy "involves anticompetitive conduct." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 15–16 & n. 25, 104 S.Ct. 1551, 1559–60 & n. 25, 80 L.Ed.2d 2 (1984). Thus, in a price-fixing case under the Sherman Act, the government does not have "the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions." *United States v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927). The unreasonableness of the prices achieved pursuant to a price-fixing agreement is irrelevant. *Broadcast Music,* 441 U.S. at 8 n. 11, 99 S.Ct. at 1556 n. 11.

Likewise, in *Socony–Vacuum Oil Co.,* the Supreme Court made clear that showing effect or success is not required to establish a violation of § 1 of the Sherman Act: "It is the 'contract, combination ... or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, *whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other.*" *Socony–Vacuum,* 310 U.S. at 224 n. 59, 60 S.Ct. at 845–46 n. 59 (citations omitted). "And the amount of interstate or foreign trade involved is not material since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected." *Id.* (citing *Patterson v. United States,* 222 F. 599, 618, 619 (6th Cir.), *cert. denied,* 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499 (1915); *Steers v. United States,* 192 F. 1, 5 (6th Cir.1911)). Thus, as the district court in this case recognized, the success of a price-fixing agreement is irrelevant for establishing a violation of § 1 of the Sherman Act.

6. While this interpretation is broad, it is compelled by the plain language of the Antitrust Guidelines. Moreover, as discussed below, this interpretation is consistent with the purposes of the Sherman Act and with the Sentencing Commission's intent.

It would be an anomaly to declare price-fixing illegal per se, without regard to its success, merely because of its plainly anti-competitive effect, but to provide for a fine only if the price-fixing were successful. Such a rule would result in the government being relieved of the burden of ascertaining a conspiracy's effect and success for purposes of obtaining a conviction only to have to bear that very burden to establish the propriety of any fine. *See Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 15–16 & n. 25, 104 S.Ct. at 1559–60 & n. 25; *Socony–Vacuum,* 310 U.S. at 224 n. 59, 60 S.Ct. at 845–46 n. 59; *Trenton Potteries Co.,* 273 U.S. at 397–98, 47 S.Ct. at 379–80 (1927). Moreover, to do so would allow the defendant who was found guilty of participating in an unsuccessful price-fixing conspiracy to escape with no fine. *See United States v. Jennings,* 945 F.2d 129, 136 (6th Cir.1991), *modified,* 966 F.2d 184 (6th. Cir. 1992) (stating that we must avoid interpretations of the Guidelines that would produce an absurd result if an alternative interpretation that is consistent with the purpose of the Guidelines exists).[7]

Moreover, this interpretation is supported by the Sentencing Commission's Commentary to the Antitrust Guideline. Commentary that interprets a guideline or explains its application generally controls. *Stinson v. United States,* — U.S. —, — – —, 113 S.Ct. 1913, 1917–18, 123 L.Ed.2d 598 (1993) (citing U.S.S.G. § 1B1.7); *see United States v. Warshawsky,* 20 F.3d 204, 212–13 (6th Cir.1994) (applying commentary as controlling). The commentary is to "be treated as an agency's interpretation of its own legislative rule." *Stinson,* — U.S. at —, 113 S.Ct. at 1919. Thus, provided the commentary "does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the [guideline].'" *Id.* (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

The volume of commerce affected by a defendant's violation is not limited to the sales made by the defendant at the target price during the period of the conspiracy but includes all sales of the goods (here gasoline) made by the defendant during the period of the conspiracy. "The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute." U.S.S.G. § 2R1.1 commentary (background). Thus, it clearly appears that the Sentencing Commission intended that the government have the benefit of a per se rule both at trial and at sentencing to avoid the protracted inquiry into the day-to-day success of the conspiracy.

(3)

The government also argues that the "scholarly article" analyzing the Antitrust Guideline on which the district court heavily relied for its narrow interpretation of the Antitrust Guideline provides no support for the district court's conclusion. *See* J.A. 35–36. The authors of the article reasoned that the Sentencing Commission intended that "the 'volume of commerce' should only include the commerce directly involved in the conspiracy. Thus, the phrase 'were affected by the violation' should be interpreted to include only the commerce that is in fact involved in a given conspiracy." Mark A. Cohen & David T. Scheffman, *The Antitrust Sentencing Guideline: Is the Punishment Worth the Costs?,* 27 Am.Crim. L.Rev. 331, 349 (1989) (footnote omitted). However, the authors make no suggestion that the volume of commerce "directly involved in the conspiracy" depends upon the day-to-day effect or success of a price-fixing conspiracy. The authors' reading of the Antitrust Guideline is not inconsistent with our conclusion that the volume of commerce involved in this case includes all sales of gasoline made by defendants during the entire 234–week period of the conspiracy.

As the government points out, the fact that some of the conspirators occasionally sold

7. We recognize that the defendant would still be subject to imprisonment, however, "[s]ubstantial fines are [supposed to be] an essential part of the sanction." U.S.S.G. § 2R1.1 commentary (background).

gasoline at less than the agreed-on price does not mean that such sales were not affected by the price-fixing conspiracy. In its brief, the government states, "[E]ven when prices were falling from agreed-on levels, either because of cheating or to meet a price charged by a non-conspirator, the conspirators constantly were attempting to influence those prices through meetings or telephone calls before prices 'got ... way out of line.'" Appellant's Brief at 26 (quoting J.A. 192). Thus, the resulting price would have been affected by the conspiracy and would not necessarily be the same as a free-market price. "Moreover, a price drop by one or more of the conspirators might simply reflect an attempt to discipline a price maverick and be considered proof that the conspiracy is alive and well rather than ineffective." *Id.* (citing J.A. 269–70). In conclusion, we do not believe that the article provides any greater support for the district court's interpretation than it does for our interpretation of the Antitrust Guideline.

(4)

In response to the government's argument, defendants make several arguments that we shall consider seriatim. First, defendants argue that application note 6 of the commentary to the Antitrust Guideline, which addresses bid-rigging conspiracies, supports the district court's conclusion. The commentary provides:

> Understatement of seriousness is especially likely in cases involving complementary bids. If, for example, the defendant participated in an agreement not to submit a bid, or to submit an unreasonably high bid, on one occasion, in exchange for his being allowed to win a subsequent bid that he did not in fact win, his volume of commerce would be zero, although he would have contributed to harm that possibly was quite substantial.

U.S.S.G. § 2R1.1 commentary (application note 6). The result of such a case would be that the defendant's "volume of commerce will understate the volume affected by his participation in the bidding scheme." *United States v. Heffernan,* 43 F.3d 1144, 1147 (7th Cir.1994) (citing U.S.S.G. § 2R1.1 commentary (application note 6)). Defendants argue that such a result is inconsistent with our interpretation of the Antitrust Guideline. They give the following example to illustrate their point:

> [I]f an asphalt producer agreed with his competitors to submit complimentary bids on a series of contracts over several years but was never the successful bidder ... his total asphalt sales during the conspiracy period would be affected and his sales would equal his "affected" volume of commerce. The Commentary, however, says that the volume of commerce affected by the conspiracy would be *zero.*

Appellees' Brief at 28. However, as the commentary clearly suggests, a bid-rigging conspiracy is unique and is different from a price-fixing conspiracy, which involves posted prices. A bid-rigging conspiracy involve sales made to particular victims pursuant to distinct contracts; its scope is limited to those distinct contracts. As the government states, "Because the hypothetical defendant was never awarded a contract pursuant to the bid rigging agreement, 'the volume of commerce attributable to' him must be zero because he made no sales pursuant to the agreement." Appellant's Reply Brief at 7. In contrast, a price-fixing conspiracy involves sales made to purchasers generally; its scope extends to all sales of the specific types of goods or services which were made by the defendant or his principal during the period of the conspiracy. Defendants fail to explain how a conspiracy to submit complimentary bids on a series of contracts would affect the general sales of the asphalt producer not connected to the bid-rigging conspiracy. Accordingly, this illustration is too strained to be helpful.

Defendants also argue that we should apply the rule of lenity in interpreting the Antitrust Guideline. *See Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752–53, 64 L.Ed.2d 381 (1980); *United States v. Rasco,* 963 F.2d 132, 137 (6th Cir.), *cert. denied,* ––– U.S. ––––, 113 S.Ct. 238, 121 L.Ed.2d 173 (1992). That rule "applies only when, after consulting traditional canons of statutory construction, [the court is] left with

an ambiguous statute." *United States v. Shabani,* — U.S. —, —, 115 S.Ct. 382, 386, 130 L.Ed.2d 225 (1994). Because we have determined that the language used by the Sentencing Commission is clear, the rule of lenity is inapplicable here, and we need not consider this argument further.

Defendants suggest that the district court's interpretation of the Antitrust Guideline does not, as the government contends, undermine the per se rule of the Sherman Act. Defendants concede that the per se rule does not require an inquiry into the volume of commerce affected for purposes of determining guilt and agree that the Antitrust Guideline does require an inquiry into the volume of commerce affected. From this proposition, they argue that interpreting "volume of commerce" as we do would remove the requirement of an inquiry into the volume of commerce. We disagree. The district court would be required to determine the sales of the specific type of goods that were price-fixed made by the defendant or his principal during the period of the conspiracy. We acknowledge that this inquiry would not be as burdensome as inquiring into whether individual sales were made at the target price, but we do not believe that either the Antitrust Guideline or the Sherman Act requires this more burdensome inquiry. Thus, this argument is rejected.

Next, defendants argue that the district court's interpretation is consistent with the theory of optimal penalties. Under this theory, the goal of any penalty is to prevent crimes that are socially inefficient. In accordance with this theory, to minimize the social costs of either underdeterrence or overdeterrence, the determination of a penalty must consider the social loss and the probability of detection and successful prosecution. We are aware of the economic underpinnings of the theory of optimal penalties and do not comment on how closely the penalties imposed under Antitrust Guideline mirror this theory. We find nothing other than the following commentary language that indicates that the Sentencing Commission adopted the theory of optimal penalties: "It is estimated that the *average additional profit* attributable to price fixing is 10 percent of the selling price. The Commission has specified that a fine from two to five times that amount be imposed on organizational defendants as a deterrent because of the *difficulty in identifying violators.*" U.S.S.G. § 2R1.1 commentary (background) (emphasis added). However, the sentence immediately preceding that language states, "*Substantial fines* are an essential part of the sanction." *Id.* (emphasis added). In addition, the commentary also provides:

> Tying the offense level to the scale or scope of the offense is important in order to ensure that the sanction is in fact *punitive* and that there is an incentive to desist from a violation once it has begun. The *offense levels are not based directly on the damage caused or profit made* by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute.

*Id.* (emphasis added). This language indicates that the Sentencing Commission acknowledged the theory of optimal penalties but opted for greater administrative convenience in sentencing instead of economic efficiency in the marketplace. Because we are without authority to rewrite the Antitrust Guideline to comport with economic theory, we must reject this argument.

Finally, defendants argue that the fines imposed on them by the district court were consistent with the fines imposed in *United States v. Appalachian Oil Co.,* No. 2:91–CR–78, 1993 WL 773572 (E.D. Tenn. Nov. 18, 1993). We recognize that the desire to achieve greater uniformity in sentencing was one of Congress' primary purposes in enacting the Sentencing Reform Act, 18 U.S.C. § 3551 *et seq. See United States v. Nelson,* 918 F.2d 1268, 1271 (6th Cir.1990). However, it would be absurd to endorse, for the sake of uniformity, what we consider to be an erroneous interpretation of the Antitrust Guideline because that interpretation has been applied in another case. Therefore, this argument is without merit.

## III.

For the reasons stated, the district court's judgments of conviction are AFFIRMED; however, the district court's imposition of the

fines is REVERSED, and the case is REMANDED for redetermination of the defendants' fines in a manner consistent with this opinion.