**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Cynthia A. FRASER, Defendant–Appellant.**

**No. 02–4001.**

United States Court of Appeals, Sixth Circuit.

April 3, 2003.

BEFORE: MARTIN, Chief Circuit Judge; ROGERS, Circuit Judge; and EDMUNDS, District Judge.*

PER CURIAM.

This appeal arises from Cynthia Fraser's conviction for violations of 18 U.S.C. § 371, conspiracy to defraud for the purpose of carrying on a mail or telemarketing scheme, and of 18 U.S.C. § 1342, using a fictitious name or address. Fraser claims that the evidence was insufficient to support her convictions because the United States failed to prove beyond a reasonable doubt that any of the conduct at issue actually occurred within the statute of limitations of five years. For the following reasons, we AFFIRM Fraser's conviction.

The United States indicted Cynthia Fraser on August 29, 2001, for using a fictitious name in a telemarketing scheme. The indictment alleged that Fraser had engaged in the illegal activity in question in July and August of 1996, continuing that illegal behavior through at least August 30, 1996.

The indictment arose out of Fraser's relationship with a business associate, Craig Hragyil. Hragyil and Fraser were both veterans of the telemarketing industry. Fraser had been in the business since 1980. She met Hragyil when they both worked for a man named Brian Ross, who ran a telemarketing company. When Ross began having legal problems and his business was searched. Fraser incorporated another company in her own name at his request. Fraser soon had personal problems of her own, and in the summer of 1996, she left Ross's employ and moved to California. While looking for employment, Fraser contacted Hragyil to see if he could offer her work.

In June of 1996, while still working for Ross, Hragyil was setting up a scheme called a "rip and tear" operation. This kind of scheme involves setting up a fake business and using lists of phone numbers to target consumers with offers of prizes and promotions if only the victim will send a fee to the business, in order to collect the prize. The scheme at issue here targeted victims across the country over fifty-five

---

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

years of age. Hragyil asked Fraser to facilitate opening a mailbox at an out-of-state location in order to receive victims' checks, and he offered her money to do so. He offered her one hundred dollars a week for having someone open the mailbox, and he offered to pay her cellular phone bill and to pay whoever opened the distant mailbox (also one hundred dollars a week).

Fraser agreed to the arrangement, and she completed and filed, in California, a fictitious Business Name Application for "ESB, Ltd.," calling herself "Patricia Johnson" and using a phony address. Patricia Johnson is the maiden name of an old friend of Fraser's, Patricia Wells. Fraser contacted Wells in Ohio to open the mailbox. Wells agreed, and she used "Patricia Johnson" to open a mailbox for "ESB, Ltd." at Mailboxes, Etc., in Mentor, Ohio. Wells used a false address as well. and she listed the type of business as "flags and mailers." There was evidence that Fraser had directed Wells to open the mailbox for three months, and Wells did so, renting the space for July 2, 1996, through October 2, 1996. Fraser and Hragyil paid Wells for the costs of opening the box.

Fraser claims she found nothing unusual about the fictitious name or the out-of-state mailbox. "ESB, Ltd.," however, was not a real company. Fraser further used "Patricia Johnson" to create an account with a check-cashing business in California. She used a false address and Wells' lapsed Georgia identification card, which Wells had sent to Fraser upon Fraser's request. Fraser also requested, and Wells sent, a copy of Wells' Ohio driver's license and a credit card.

Within a week of opening the mailbox, Hragyil set his scheme into action. The salespeople he had hired began making phone calls to people on the lists, and the checks from victims began arriving. Hra-

gyil had arranged the system such that salespeople notified him of how the checks were being sent, the check numbers, who was sending them, when they would arrive at the box, and what the amount was. As part of her role in the scheme, Wells forwarded the mail received in the box to California. Wells checked the box once a week, and she loaded all the mail in an envelope which she sent on to California, typically to Fraser. She called Fraser's pager to indicate that a package was forthcoming.

The first batch of forwarded mail was sent to Hragyil on July 23, 1996, and afterwards, in order to distance himself, Hragyil asked Fraser to provide Wells with pre-addressed FedEx labels.

Fraser served as the intermediary between Hragyil and Wells, who never had any personal contact. Fraser would receive the checks and other mail from Wells and give them to Hragyil. Each time Wells sent the mail, Fraser would send cash payments to Wells' home address. The packages Wells received at home from Fraser had varied return addresses, with varied names for Fraser: "Wingnut," "Mrs. Fraser," etc. Fraser never used her full correct name, nor did she ever use her own home address. Wells sent the mail at least three to four times and was paid at least three times.

On August 30, 1996, Wells sent a package to Fraser, addressed to "Cindy Wingnut." "Wingnut" was the name that Wells and Fraser had used for each other throughout their friendship and used in some of the exchanged documents during the scheme. Fraser claims that the only thing this package contained was personal correspondence from Wells and pictures of Wells' granddaughter.

Wells sent two packages without receiving any payment, and she then stopped

forwarding the mail. It is unclear when this happened, although the last victim check Hragyil received, that postal investigators were able to track, arrived on August 27, 1996. Hragyil cashed this check on August 28, 1996.

Around September 16, 1996, pursuant to complaints, an investigation into "ESB, Ltd." began. After cooperation from Fraser and Wells, Hragyil was indicted on August 27, 2001. Fraser was indicted on August 29, 2001. She moved to dismiss the indictment against her, arguing that the five-year statute of limitations had lapsed. This motion was denied, as were her subsequent motions for judgment of acquittal under Federal Rule of Criminal Procedure 29. The jury found Fraser guilty on both counts of the indictment, and she was sentenced to three months incarceration with three years supervised release. She was ordered to pay restitution of approximately $33,000 jointly and severally with Hragyil.

"[I]n our review of a motion for acquittal, we determine whether the evidence was sufficient to submit the case to the jury at the completion of the evidence for the United States." *United States v. Nabors*, 901 F.2d 1351, 1357 (6th Cir.1990). This Court has further said, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "In a criminal case the standard of review for claims of insufficient evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir.1989). Finally, as to the credibility of the testimony offered by the witnesses, "Questions of credibility are primarily for the jury to decide." *United States v. Wynn*, 987 F.2d 354, 358 (6th Cir.1993).

"A defendant claiming 'insufficiency of the evidence bears a very heavy burden.'" *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986) (quoting *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983)). This appeal pertains to the sufficiency of the evidence in proving that an indictment was timely filed, within the statute of limitations. The statute of limitations period for a violation of Section 371 "is five years, which period runs from the date of the commission of the last overt act in furtherance of the conspiracy." *United States v. Craft*, 105 F.3d 1123, 1127 (6th Cir.1997). As for the violation of Section 1342, generally "The statute of limitations begins to run when the crime is complete." *United States v. Lutz*, 154 F.3d 581, 586 (6th Cir.1998). For an offense involving the use of a fictitious name or address, the crime is defined in Section 1342 as

Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined under this title or imprisoned not more than five years, or both.

The statute of limitations, then, begins to run when the use of the fictitious name or address is complete.

The United States relies primarily on the August 30, 1996, letter from Wells to Fraser. The United States introduced substantial evidence that the letter was part of the fraudulent scheme and provid-

ed ample evidence of the conspiracy and Fraser's role in it in the days and weeks before August 30. The jury had the opportunity to observe Fraser's credibility during her testimony at trial, and the jury must have believed that the August 30 letter was not purely personal correspondence but was related to the conspiracy. "[I]n reviewing the denial of a criminal defendant's motion for acquittal, we are precluded from independently assessing the credibility of witnesses." *United States v. Bearden,* 274 F.3d 1031, 1039 (6th Cir.2001). That letter was also sent to "Cindy Wingnut," and that name was one of the aliases Fraser used during the fraud. The jury was specifically instructed on what they had to believe about the timing of the "end" of the conspiracy in order to acquit or to convict. If the jury believed that the August 30, 1996, correspondence was a continuing part of the fraud then the conduct charged in the indictment occurred within the statute of limitations.

Fraser argues that she cannot be guilty of the violation, even if the foregoing is true, because it was Wells who used the fictitious name for Fraser. Fraser did not use it for herself in the August 30, 1996, correspondence. This is a faulty argument, however, because Section 1342 says that accepting mail under a fictitious name creates a violation as well. *See* 18 U.S.C. § 1342 ("or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name . . . .").

In *United States v. Hayter Oil Co., Inc. of Greeneville, Tenn.,* 51 F.3d 1265, 1270–1271 (6th Cir.1995) (internal citation omitted), we said, "Proof of an overt act taken in furtherance of the conspiracy within the statute of limitations period would clearly demonstrate the continued existence of the conspiracy. However, once a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned." At the time Wells sent the August 30 letter to Fraser, she was still in regular contact with Fraser and receiving payment from her. At trial, the United States presented evidence from Wells that in spite of Fraser's statements to the contrary, the fraud activity continued through the end of August, and on August 30, 1996, Wells was still collecting and forwarding mail to Fraser. As further evidence, mail continued to come to the box into the middle of September, a box opened exclusively for the purpose of fraud. That mailbox was rented for a period ending long after August 29, 1996. Finally, based on information from the investigations, over $6,000 in checks would have been in the mailbox after August 27, 1996, and Hragyil would have known how much and when it was coming. Therefore, there is substantial evidence to show the existence of the continuing conspiracy.

Further, there was no affirmative evidence that the conspiracy had been abandoned, arguably, until Wells returned the keys to Mailboxes, Etc. There is evidence that Wells waited some unknown period of time after her last payment, hoping to be paid for the last two shipments of mail, before she closed the mailbox.

In *United States v. Overmyer,* 867 F.2d 937, 938 (6th Cir.1989), citing *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), this court said, "The Supreme Court has observed that the granting of a motion of acquittal, '. . . will be confined to cases where the prosecution's failure is clear.'" Based on the evidence before this court and on the deference owed to the jury as judge of the

credibility of the evidence, we AFFIRM the judgment of the district court.