REAVLEY, Circuit Judge,
dissenting:
I respectfully dissent. The jury was instructed that the government had to prove “that the conspiracy charged in the indictment continued after May 31, 1995,” and that it could so find “only if the government has proven that some action was taken by a conspirator in furtherance of the conspiracy after that date.” I do not understand the majority or appellants to find any fault with the court’s instructions relevant to limitations, and I would hold that a rational jury could have found beyond a reasonable doubt that action in furtherance of the conspiracy occurred after May 31,1995.
In the case of a price-fixing agreement, the exchange of pricing information by the *933 conspirators, and the charging to customers of artificially inflated prices made possible by the conspirators’ illegal collusion, constitute acts in furtherance of the conspiracy. This jury could find that such overt acts in furtherance of the conspiracy did occur within the limitations period.
The government proved a highly successful conspiracy to fix prices for an essentially fungible product sold by appellees and other conspirators. The agreement made possible a series of price increases above the prices that would have prevailed in a competitive environment, as evidenced by proof that prices and profit margins rose significantly after the agreement was reached, and prices dropped significantly after the government issued subpoenas to the conspirators. It is logical to believe that the conspirators, once having decided to break the law for financial gain, would continue to charge illegally fixed prices until they were caught. Hence, the Sixth Circuit has stated that “once a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned.” United States v. Hayter Oil, Inc., 51 F.3d 1265, 1270-71 (6th Cir.1995). Even if the law of our circuit does not presume as a matter of law, for limitations purposes, that a price-fixing conspiracy continues until the participants are caught, and even if the jury in the pending case was not so instructed, the jury could have reasoned that the participants would have no reason to abandon their profitable conspiracy until such time. Indeed, the conspirators managed three rounds of coordinated price increases in 1994, and a separate price increase for unfaced insulation in 1995. They apparently had no interest in voluntarily abandoning their illegal pact and returning to a competitive market.
The jury heard evidence that (1) the conspirators entered into a horizontal price-fixing agreement, the most blatant of Sherman Act violations; (2) the conspirators engaged in an extensive, organized effort to maintain the agreement by exchanging ongoing pricing information, and to conceal the agreement by charging slightly different prices; (3) the agreement was successful at raising prices and profits for the conspirators; (4) in June 1995 the conspirators continued to charge customers pursuant to price lists agreed upon under the price-fixing agreement, as evidenced by numerous examples of invoices and corresponding price lists admitted at trial; (5) prices dropped after the issuance of subpoenas in June of 1995, and had “dropped dramatically” according to one witness by the time of trial; (6) Mark Engebretson of Therm-All was an active participant in the conspiracy, was involved in the exchange of pricing information and fixing of prices, had talked to Roger Ferry of CGI about pricing, and had communicated with Ferry by fax and phone into June 1995, although the contents of the June 1995 communications were not explicitly revealed at trial; (7) when asked when the price-fixing agreement ended, Janne Smith of Bay, the whistleblower, testified, “I guess after people started getting served subpoenas” in June of 1995, and later testified, with respect to what was “happening in the marketplace” after the subpoenas issued, that “[tjhings started returning to how they were before and things started becoming more competitive again;” and (8) Huber Rhodes, a Mizell vice president, active participant in the conspiracy, and key government witness, testified that the price-fixing agreement continued until June of 1995, “when the FBI came in Mizell Brothers with a subpoena from the Justice Department.” This evidence was sufficient to prove that overt acts in furtherance of the conspiracy, especially the continued charging of agreed, artificially high prices to customers, as well as the *934 continued exchange of pricing information, occurred within the limitations period.