UNITED STATES of America,

v.

SKW METALS & ALLOYS, INC. and Charles Zak, Defendants.

No. 96–CR–71S.

United States District Court, W.D. New York.

Dec. 4, 1997.

Melvin Lubinski and Edward Friedman, U.S. Dept of Justice, Antitrust Division, New York City, for Plaintiff.

George P. Kucik and Nada S. Sulaiman, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, & Victor T. Fuzak and Kevin M. Kearney, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Defendants.

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Presently before this Court are Defendants' objections to the interpretation of the 1990 Antitrust Sentencing Guideline (U.S.S.G. § 2R1.1) contained in the Presentence Investigation Reports. Specifically, Defendants object to the Probation Officer's conclusion that where the Antitrust Guideline refers to "the volume of commerce done by him or his principal in goods or services that were affected by the violation" (U.S.S.G. § 2R1.1(b)(2)), sentencing pursuant to the Guideline should take into account the total sales of the product involved in the conspiracy made by the Defendant, rather than those sales that can be directly connected to the price-fixing conspiracy.

On March 17, 1997, upon a jury verdict, Defendants Charles Zak and SKW Metal & Alloys, Inc. ("SKW") were convicted on Count One of a two-count Indictment for conspiring to fix prices of commodity ferrosilicon in violation of the Sherman Act, 15 U.S.C. § 1. Presentence Investigation Reports were prepared by U.S. Probation Officer Michael Quarantillo regarding Defendants Zak ("Zak PSR") and SKW ("SKW PSR").[1] On September 23, 1997, counsel for

---

1. In addition to the Zak and SKW PSRs, the relevant submissions include the Memorandum of Law in Support of Objections of Defendant SKW to the PSR ("SKW Obj."), Memorandum on Behalf of Charles Zak in Support of Objections to the PSR ("SKW Obj."), Government's Memorandum in Support of Objections to the SKW PSR ("Gov't SKW Obj."), Government's Memorandum in Support of Objections to the Zak PSR ("Gov't Zak Obj."), Response to Government's Objections to Zak PSR ("Zak Resp."), Response of Defendant SKW to Objections

parties appeared before this Court for a status conference regarding sentencing of Defendants. It became clear from the proceedings at this status conference, and from the parties' submissions, that sentencing in this matter should be delayed pending the Court's decision on the proper interpretation of the "volume of commerce" as used in the Antitrust Sentencing Guideline. U.S.S.G. § 2R1.1.

Defendants contend that "volume of commerce" should be interpreted narrowly, so that it includes only those sales of ferrosilicon that could be directly attributed to the price-fixing conspiracy, that is, the sales that were made at or above the illegally-fixed target price. The Government contends that "volume of commerce" should be interpreted broadly, so that it includes SKW's total sales of ferrosilicon products over the entire duration of the conspiracy.

For the reasons set forth below, this Court agrees with the Defendants that under the Antitrust Guideline, the term "volume of commerce" refers only to those sales that can be directly connected to the price-fixing conspiracy, that is, those sales made by Defendant SKW for which the conspirators successfully achieved their illegally-fixed target price.

### DISCUSSION

I. The Antitrust Guideline

■ The 1990 version of the Antitrust Guideline, U.S.S.G. § 2R1.1,[2] entitled "Bid Rigging, Price–Fixing or Market Allocation agreements Among Competitors" provides:

(a) Base Offense Level: 9

(b) Specific Offense Characteristics

(1) If the conduct involved participation in an agreement to submit non-competitive bids, increase by 1 level.

(2) If the **volume of commerce** attributable to the defendant was less than $1,000,000 or more than $4,000,000, adjust the offense level as follows:

| Volume of Commerce (Apply the Greatest) | Adjustment to Offense Level |
| --- | --- |
| (A) Less than $1,000,000 | subtract 1 |
| (B) $1,000,000—$4,000,000 | no adjustment |
| (C) More than $4,000,000 | add 1 |
| (D) More than $15,000,000 | add 2 |
| (E) More than $50,000,000 | add 3 |

For purposes of this guideline, **the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation.** When multiple counts of conspiracies are involved, the volume of commerce should be treated cumulatively to determine a single, combined offense level.

(c) Fines

A fine shall be imposed in addition to any term of imprisonment. The guideline fine range for an individual conspirator is from 4 to 10 percent of the **volume of commerce,** but not less than $20,000. The fine range for an organization is from 20 to 50 percent of the **volume of commerce,** but not less than $100,000.

U.S.S.G. § 2R1.1 (1990) (emphasis added).

Therefore, a sentence pursuant to the Antitrust Guideline is dependent in part on the

---

Raised by the Government ("SKW Resp."), Government's Memorandum in Opposition to Defendants' Objections to Presentence Reports ("Gov't Resp.").

2. The parties and the Probation Officer agree that Defendants are to be sentenced under the 1990 Sentencing Guidelines. (Zak Obj. 2.) Generally, the Court will sentence a defendant pursuant to the Guidelines Manual in effect on the date the defendant is sentenced. U.S.S.G. § 1B1.11(a). However, if the sentence under the Guidelines Manual in effect on the date of sentencing would exceed the sentence under the Guidelines Manual in effect on the date that the offense was committed, the defendant is sentenced pursuant to the earlier version in order to avoid an ex post facto violation. See U.S.S.G.

§ 1B1.11(b)(1); *United States v. Rodriguez,* 989 F.2d 583, 587 (2d Cir.1993). Such is the case here in light of amendments to the Antitrust Guideline that became effective November 1, 1991. Under the 1990 Guidelines, Defendant Zak faces a minimum offense level of eight (8), yielding a guideline sentence of 2–8 months. Under the 1996 Guidelines, Defendant Zak faces a minimum offense level of ten (10), yielding a guideline sentence of 6–12 months. *See* U.S.S.G. §§ 2R1.1(a), (b)(2), 5A (1990, 1996). While parties dispute the exact dates that the conspiracy was in effect, the conduct for which Defendants were convicted under Count I occurred no later than June 30, 1991. (Zak PSR ¶ 7.; SKW PSR ¶ 6 .)

"volume of commerce" in two ways: as an adjustment to the offense level pursuant to § 2R1.1(b)(2), and as a determinant of the appropriate fine pursuant to § 2R1.1(c).

The Probation Officer adopted the broad interpretation of "volume of commerce" supported by the Government, calculating the volume of commerce for the purposes of the Guideline at $29,971,000, from the "net sales of [SKW's] ferrosilicon from October 1, 1989 through June 30, 1991."[3] (Zak PSR ¶ 8.; SKW PSR ¶ 7.) Based on this value, the Probation Officer recommended a two level upward adjustment for Defendant Zak pursuant to § 2R1.1(b)(2). (Zak PSR ¶ 14.) This value was also used to calculate the appropriate fine range for Defendants Zak and SKW pursuant to § 2R1.1(c). (Zak PSR ¶ 39.; SKW PSR ¶ 31.)

## II. "Volume of commerce"

■ Defendants object to the use of SKW's total net sales of ferrosilicon products during the alleged conspiracy period. Defendants argue that the volume of commerce, for purposes of the Antitrust Guideline, should be based only on the sales of ferrosilicon that could be directly attributed to the price-fixing conspiracy, that is, the amount sold at or above the floor price, a total no greater than $100,627. (Zak Obj. 5; SKW Obj. 5.) The Government argues that under the Antitrust Guideline, the volume of commerce is Defendant SKW's total sales of ferrosilicon products during the entire duration of the conspiracy. (Gov't Resp. 3.)

### A. The Plain Language

Both parties contend that their positions are supported by the plain language of the Antitrust Guideline. The first effort in interpreting the phrase "volume of commerce ... in goods or services that were affected by the violation" is the common, everyday usage. *See Williams v. United States*, 503 U.S. 193, 199–201, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) (construing the plain language of

the Sentencing Guidelines); *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 506 (2d Cir.1991) ("The words of a statute should be given their normal meaning and effect in the absence of a showing that some other meaning was intended.").

Not surprisingly, the parties disagree on the reading of the plain language of the Antitrust Guideline, even after consultation with WEBSTER'S THIRD NEW INT'L DICTIONARY for a definition of the word "affect." Defendant Zak notes that "affect" is defined as "to produce an effect ... upon", "to produce a material influence upon or alteration in", or "to have a detrimental influence on." Defendant contends that this places the burden on the Government to establish a connection between the price-fixing conspiracy and SKW's ferrosilicon prices. (Zak Obj. 7.) Meanwhile, the Government noted that the word "affect" is synonymous with the word "influence", which is defined as "to affect or alter the conduct, thought, or character of by direct or intangible means." (Gov't Resp. 4.); *see also Hayter Oil*, 51 F.3d at 1272–73. The Government argues that this supports a broader definition of the volume of commerce, since " 'affected' commerce must include all commerce that was influenced by or subject to the price fixing agreement." (Gov't Resp. 4.) As such, "SKW's volume of commerce must include all sales of commodity ferrosilicon products that it made during the duration of the conspiracy." (Gov't Resp. 4–5.)

While not conclusive, the plain language of the Antitrust Guideline tends to support the Defendants' position that the "volume of commerce ... affected by the violation" applies to goods that were sold by SKW at or above prices agreed upon as part of the conspiracy. This is the meaning that appears most obvious to this Court simply by reading the Antitrust Guideline. Consultation with a dictionary would only strengthen this Court's initial impression that the Guideline envisions a narrower view than the Government proposes. The Antitrust Guideline

---

**3.** The Probation Officer also relied on *United States v. Hayter Oil Co.*, 51 F.3d 1265 (6th Cir. 1995), which is the only circuit to have addressed this issue. In *Hayter Oil*, the Sixth Circuit interpreted "volume of commerce" to in-

clude all sales made by Defendant during the conspiracy, reversing the district court that had interpreted "volume of commerce" to include only those sales for which defendants were able to achieve their target price. *Id.* at 1272–73.

uses the word "affected" not "influenced", and this Court is reluctant to go fishing for synonyms to assist it in statutory interpretation. Nonetheless, the plain language of the statute is not entirely sufficient for purposes of a clear definition of the "volume of commerce" to be used here.

## B. The Commentary

The Defendants and the Government also contend that their respective positions are supported by the Sentencing Commission's Commentary to the Antitrust Guideline. Commentary that interprets a guideline or explains its application generally controls. *See* U.S.S.G. § 1B1.7; *see also Stinson v. United States*, 508 U.S. 36, 44, 113 S.Ct. 1913, 1918, 123 L.Ed.2d 598 (1993) ("[C]ommentary explains the guidelines and provides concrete guidance as to how even unambiguous guidelines are to be applied in practice.").

A close and thorough reading of the 1990 Antitrust Guideline Commentary supports the view that "volume of commerce," as used in the Antitrust Guideline, includes only those products that were sold at or above the target price of the conspiracy. Several statements in the Commentary establish that there should be a connection between the profit gained by the price-fixing conspiracy and the sentence imposed pursuant to the Antitrust Guideline. In order to profit from the conspiracy, a firm would have to sell products at a price that was illegally inflated by the conspiracy.

For example, the Commentary to the Antitrust Guideline states:

> Because the guideline sentences depend on the volume of commerce done by each firm, role in the offense is implicitly taken into account. Accordingly, the provisions of § 3B1.1 (Aggravating Role) are to be applied only in unusual circumstances.... Conversely, a decrease for role under § 3B1.2 (Mitigating Role) would not be appropriate merely because an individual defendant or his firm did not profit substantially from the violation. An individual defendant should be considered for a downward adjustment for a mitigating role in the offense only if he was responsible in some minor way for his firm's participation in the conspiracy.

U.S.S.G. § 2R1.1 (Application Note 1.) This statement, by articulating the relationship between the Antitrust Guideline and a § 3B1.2 reduction, establishes a connection between the profit obtained by a firm from the price-fixing (and therefore the sales made at illegally inflated prices) and the sentence imposed pursuant to the Antitrust Guideline.

This connection between profit and the "volume of commerce" for purposes of the Antitrust Guideline appears elsewhere in the Commentary. In fact, the Commentary clearly illustrates that the Antitrust Guideline relies on the "volume of commerce" to estimate the profit gained through the price-fixing and used this estimate to set the appropriate fine range:

> Substantial fines are an essential part of the sanction. It is estimated that the average additional profit attributable to price fixing is 10 percent of the selling price. The Commission has specified that a fine from two to five times that amount be imposed on organizational defendants as a deterrent because of the difficulty in identifying violators.

U.S.S.G. § 2R1.1 (Background.)

The Commission has, in essence, set up a formula for the fine range applicable to organizations. The fine is set at two to five times the profit obtained by the price-fixing. The profit is assumed to be ten percent of the illegally inflated selling price. Therefore, by setting the fine at 20 to 50 percent of the volume of commerce, the Commission has relied on the assumption that the volume of commerce includes profit from price-fixing, which requires that the commerce at issue be sold at or above the illegally fixed price.[4]

---

4. For example, suppose that a Company W sold $100,000,000 of widgets from Jan. 1 to Dec. 31, 1990. Suppose that as part of a price-fixing conspiracy that lasted from Jan 1. To Dec. 31, 1990, Company W sold $10,000,000 of widgets at an illegally inflated price. The Commentary states that for simplification purposes, the assumed profit is 10% of the illegally inflated sales, which would be $1,000,000. The Commentary also states that the appropriate fine would be two

### C. The Government's Additional Arguments

The Government points to other sections of the Commentary in support of its position. The Government relies on the following paragraph from the Antitrust Guideline Commentary in support of its position:

> Tying the offense level to the scale or scope of the offense is important to ensure that the sanction is in fact punitive and that there is an incentive to desist from a violation once it has begun. The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute.

U.S.S.G. § 2R1.1 (Background.) The Government argues that this makes it clear that in its efforts to relieve the sentencing court from a burdensome inquiry into the specific transactions at issue, the Sentencing Commission decided to lessen the court's and the Government's burden by introducing the broad interpretation of "volume of commerce." (Gov't Resp 9–10.); *see also Hayter Oil*, 51 F.3d at 1274.

The Government's reliance on this paragraph is misplaced in several regards. First, like other sections of the Antitrust Guideline Commentary, this paragraph indicates that there is a connection between the level of punishment under the Antitrust Guideline and the actual success of the price-fixing conspiracy. By "[t]ying the offense level to the scale or scope of the offense ... [as] an incentive to desist from a violation once it has begun," the Guideline clearly envisions a connection between ongoing price-fixing activity and the level of punishment.

Second, where the Guideline Commentary states that "volume of commerce is an acceptable and more readily measurable substitute," it is referring to a substitute for the profits obtained by the conspiracy. The Government argues that this indicates the intent of the Sentencing Commission to relieve judges from the burden of "determining the actual day-to-day effect of a per se violation of the antitrust laws." (Gov't Resp. 10.) But there is no indication that the Commission intended to simplify the sentencing court's fact-finding in such a manner. The Antitrust Guideline Commentary indicates that the Commission intended to relieve the sentencing court of the burden of an inquiry into the profits or damages resulting from the conspiracy by assuming that the illegal profit is ten percent of the selling price. What remains for the sentencing court is to inquire into how many sales included this illegal profit.[5] Such an inquiry is thoroughly consistent with the role of the district court in implementing the Sentencing Guidelines. *See United States v. Stevens*, 985 F.2d 1175, 1184 (2d Cir.1993) ("Though requiring a district judge to make specific factual findings in determining the applicable sentencing guidelines may interfere with the smooth operation of the sentencing hearing, specific findings are needed to permit appellate review of the sentence imposed." (citations and quotations omitted)); *United States v. Jacobs*, 117 F.3d 82, 95–98 (2d Cir.1997) (discussing the factual findings necessary for the sentencing court to estimate the amount of loss in a fraud scheme and upholding this Court's calculations of loss.)

The Government also argues that the Sentencing Commission, recognizing that the Sherman Act permits conviction without

---

to five times the illegal profits, producing a fine range of $2,000,000 to $5,000,000. Meanwhile, the Antitrust Guideline itself states that the appropriate organizational fine is 20 to 50 percent of the volume of commerce. U.S.S.G. § 2R1.1(c). Therefore, in order for the Guideline sentence to correspond to the methodology articulated in the Commentary, the volume of commerce for the purposes of the Guideline must be $10,000,000.

5. In the case of Company W, suppose the court was required to independently determine the total profits obtained by Company W from the conspiracy. The court would be required to conduct a two-step factual finding process. First, the court would be required to make a finding on the total amount of sales that were made at the target price ($10,000,000 in the case of Company W.) Then, the court would be required to determine the portion of each of these individual sales that could be classified as illegal profit gained from the price-fixing conspiracy. In an effort to remove the burden of this second inquiry, the Guideline Commentary indicates that the court should assume a 10% profit.

proof of success of the conspiracy,[6] intended to extend this rule to the Antitrust Guideline to exempt the Government from providing any evidence of a successful conspiracy. (Gov't Resp. 9.) ("Nothing in the Antitrust Guideline even suggests that facts that were immaterial in determining defendants' guilt should determine their sentences."); *see also Hayter Oil,* 51 F.3d at 1274 ("[I]t clearly appears that the Sentencing Commission intended that the Government have the benefit of a per se rule both at trial and at sentencing to avoid the protracted inquiry into the day-to-day success of the conspiracy.")

In support, the Government points to the following Commentary:

The agreements among competitors covered by this section are almost invariably covert conspiracies that are intended to and serve no purpose other than to restrict output and raise prices, and that are so plainly anticompetitive that they have been recognized as illegal *per se, i.e.,* without any inquiry in individual cases as to their actual competitive effect.

U.S.S.G. § 2R1.1 (Background.) Yet this general commentary does no more than reiterate the policy behind the per se rule for convictions under the antitrust laws. The Government ignores the specific provisions of the Commentary, discussed *supra,* that establish a clear link between the profits obtained by the illegal price-fixing and the sentence imposed under the Antitrust Guideline.

The Government also argues that substantial fines are an essential part of the sentence for per se antitrust violations,[7] which necessitates the broad interpretation of "volume of commerce." (Gov't Resp. 9–10.) To this end, the Government argues that the Sentencing Commission "expressly was not attempting to set the fine as the amount of loss caused by the violation." (Gov't Resp. 11.) Yet, this assertion again ignores those sec-

tions of the Commentary, discussed *supra,* that explicitly connect the fine with the amount of profit. In *Hayter Oil,* the court also relied on the per se nature of antitrust violations and the deterrent effect of fines to support its holding. The court stated:

It would be an anomaly to declare price-fixing illegal per se, without regard to its success, merely because of its plainly anticompetitive effect, but to provide for a fine only if the price-fixing were successful.... Moreover, to do so would allow the defendant who was found guilty of participating in an unsuccessful price-fixing conspiracy to escape with no fine.

*Hayter Oil,* 51 F.3d at 1274. In reaching this conclusion, however, the court failed to consider the express language of the Antitrust Guideline that establishes minimum fines of $20,000 for individuals and $100,000 for organizations regardless of the volume of commerce. *See* U.S.S.G. § 2R1.1(c).

This Court is certainly aware of the important goal of deterrence that is an integral part the Antitrust Guideline, and this Court is just as earnest in its belief that antitrust violations are very serious criminal violations. Yet, this justifiable concern with deterrence cannot be used to justify an interpretation of the Antitrust Guideline that is contrary to the guidance provided by the applicable Commentary. Cognizant of these interests, this Court interprets the Antitrust Guideline as directed by the Sentencing Commission's Commentary on the Guideline, as supported by the plain language of the Guideline, and consistent with the Sherman Act and the important interest in deterrence of antitrust violations.

## CONCLUSION

For the reasons set forth above, this Court agrees with the Defendants' objections to the

---

**6.** *See, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 845–46 n. 59, 84 L.Ed. 1129 (1940); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 15 n. 25, 104 S.Ct. 1551, 1560 n. 25, 80 L.Ed.2d 2 (1984) ("The rationale for per se rules in part is to avoid a burdensome inquiry into actual market conditions where the likelihood of anticompetitive conduct is so great as to render unjustified the

costs of determining whether the particular case at bar involves anticompetitive conduct.")

**7.** "The Commission believes that the most effective method to deter individuals from committing this crime is through imposing short prison sentences with large fines. The controlling consideration underlying this guideline is general deterrence." U.S .S.G. § 2R1.1 (Background).

interpretation of the 1990 Antitrust Guideline (U.S.S.G. § 2R1.1) in the Presentence Investigation Reports. Under the 1990 Antitrust Guideline, the term "volume of commerce" refers only to those sales that can be directly connected to the price-fixing conspiracy, that is, those sales of ferrosilicon made by Defendant SKW for which the conspirators successfully achieved their illegally-fixed target price.

### ORDER

IT IS HEREBY ORDERED that sentencing in this matter will proceed consistent with this Court's determination of the "volume of commerce."

FURTHER, that Defendants shall file with the Clerk of the Court and serve a copy of any additional submissions regarding the "volume of commerce" by Monday, December 22, 1997.

FURTHER, that the Government shall file with the Clerk of the Court and serve any response thereto by Monday, January 12, 1998.

FURTHER, that Defendant Charles Zak and counsel for the parties shall appear before this Court on Friday, January 30, 1998 at 9:00 a .m. in Part IV, United States Courthouse, 68 Court Street, Buffalo, New York for sentencing.

SO ORDERED.