[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-12788

_____

D. C. Docket No. 97-00853-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY J. GIORDANO, SR.,
ANTHONY J. GIORDANO, JR.,
RANDOLPH J. WEIL,
ATLAS IRON PROCESSORS, INC.,
DAVID GIORDANO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(August 15, 2001)**

Before EDMONDSON, BLACK and MCKAY*, Circuit Judges

BLACK, Circuit Judge:

_____

*Honorable Monroe G. McKay, U.S. Circuit Judge for the Tenth Circuit, sitting by designation.

On November 13, 1997, Appellants Anthony Giordano, Sr. (Anthony, Sr.), Anthony Giordano, Jr. (Anthony, Jr.), David Giordano (David), Randolph Weil (Weil), and Atlas Iron Processors, Inc. (Atlas), were indicted in an antitrust conspiracy.[1] Appellants were charged with conspiring to restrain competition in the scrap metal industry for a one-month period between October 24 and November 23, 1992, in violation of the Sherman Act, 15 U.S.C. § 1. The indictment alleged that the owners and operators of two south Florida scrap metal companies–Atlas and Sunshine Metal Processing, Inc. (Sunshine)–had, in the wake of Hurricane Andrew,[2] fixed the prices of scrap metal and allocated suppliers of scrap metal. A jury found all Appellants guilty as charged. Appellants appeal their convictions and sentences, raising the following issues: (1) the Government failed to properly plead and prove jurisdiction; (2) the Government presented insufficient evidence to sustain Appellant Weil's conviction; (3) certain evidence admitted under Fed. R. Evid. 404(b) should not have been admitted; (4) the jury should have been allowed to consider the reasonableness of Appellants' alleged price-fixing

---

[1]Sunshine Metal Processing, Inc., was also charged in the indictment, but it is not a party to this appeal.

[2]On the morning of August 24, 1992, Hurricane Andrew caused massive destruction and property damage in South Florida.

agreement; and (5) the district court erred in applying the Sentencing Guidelines.[3]

We affirm Appellants' convictions and sentences for the reasons stated below.

## I.  BACKGROUND

On appeal, we must consider the evidence in the light most favorable to the verdict, drawing all reasonable inferences and making all credibility determinations in favor of the jury's decision.  *United States v. Aquafredda*, 834 F.2d 915, 916-17 (11th Cir. 1987).  Viewed in this light, the evidence at trial established the following.

Atlas, a Cleveland-based scrap metal company owned by the Giordano family, operated Miami River Recycling, a scrap facility located in Miami. Anthony, Sr. was an owner of Atlas who also served as the chairman of its board. Anthony, Jr. was an owner of Atlas and also served as its president and chief executive officer. David was an owner of Atlas and served as its treasurer. Sunshine was a scrap metal recycling company located in Opa Locka, Florida.

---

[3]Appellants also raise the following issues on appeal: (1) the Government constructively amended the indictment; (2) the district court abused its discretion in denying Appellants' motion for a bill of particulars; (3) the Government failed to disclose certain material as required under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); (4) the Government's closing argument was inflammatory and prejudiced Appellants' ability to receive a fair trial; and (5) the district court abused its discretion in excluding the results of polygraph tests conducted by Appellants.  We affirm on these issues without discussion.  *See* 11th Cir. R. 36-1.

Weil was an owner of Sunshine, and he also served as its president and chief executive officer.

In mid-1992, Atlas transferred scrap buyer Sheila McConnell (McConnell) from its Cleveland facility to Atlas-Miami River in Miami. In McConnell's view, Sunshine was Atlas' primary competition in South Florida. In order to procure a steady supply of scrap for Atlas-Miami River, McConnell routinely offered scrap metal suppliers prices that were higher than those offered by Sunshine. As a result, Atlas-Miami River and Sunshine became engaged in a "price war" soon after McConnell's arrival in Miami.

On October 24, 1992, Anthony, Jr. summoned McConnell and told her they would be attending a meeting with representatives of Sunshine, including Weil, "to see what we can do about these prices." Anthony, Jr. said he, Anthony, Sr., and Weil had "grave reservations" about McConnell attending the meeting because she was not a principal of either company. Anthony, Jr. felt she needed to be there, however, because she understood prices in the Miami market, and he did not. McConnell testified that she told Anthony, Jr. that it was illegal to have a meeting to discuss prices with one's competitors, but Anthony, Jr. "just laughed."

Anthony, Jr. drove McConnell to the Sea Ranch condominium complex in Ft. Lauderdale, Florida, where they met Anthony, Sr., Weil, and Henry "Skip"

4

Kovinsky (Kovinsky), a part owner and secretary/treasurer of Sunshine. At trial, McConnell and Kovinsky testified about the meeting, and the extensive notes McConnell took at the meeting were introduced into evidence. According to McConnell, Anthony, Jr. began the meeting by stating, "We all know why we are here. We need to get these prices down. We are competing with one another. The only one making any money is the auto wrecker and we need to get these prices in line." Weil then proceeded to read prices from a computer print-out of a price list. At Anthony, Jr.'s instruction, McConnell wrote these prices in her notebook. Weil announced prices for several geographic areas. He then discussed maximum buying prices for individual suppliers.

After fixing prices for flattened and whole cars, the participants in the meeting addressed Weil's demand that McConnell stop quoting prices to certain dealers located near Sunshine. Anthony, Jr. stated that Atlas-Miami River needed more scrap, and Atlas-Miami River, unlike Sunshine, was not conveniently located near several auto wrecking yards. Anthony, Jr. agreed to keep McConnell away from the dealers near Sunshine in exchange for "some cars that [Weil] had accumulated in the Bahamas." Subsequently, Atlas-Miami River did in fact receive a shipment of cars from the Bahamas pursuant to the Sea Ranch Agreement.

On the way back to Miami after the Sea Ranch meeting, McConnell complained to Anthony, Jr. that the agreement would prevent her from competing with Sunshine, that the agreement was illegal, and that Weil could not be trusted. Anthony, Jr. told McConnell to "drop the prices" and "just see what happens, just see how it goes." When they arrived in Miami, Anthony, Jr. met with his brother, David, who had not attended the Sea Ranch meeting. After he spoke with Anthony, Jr., David ordered McConnell to "drop the prices." David also gave Weil's phone number to McConnell and told her to call Weil if she had questions about the agreement.

Kovinsky testified that Weil said he thought the Sea Ranch Agreement was "worthwhile" because Hurricane Andrew had created a surplus of scrap metal. Weil thought it should be possible to purchase the hurricane scrap at low prices, and he wanted to "see how far [the Sea Ranch Agreement] runs for the moment."

McConnell testified that she lowered her prices in accordance with the Sea Ranch Agreement, and that Weil lowered Sunshine's prices. Receipts showed that Atlas-Miami River's and Sunshine's prices decreased in a manner consistent with the prices McConnell recorded in her notebook at the Sea Ranch meeting. McConnell was concerned about the agreement not only because it was illegal, but also because she thought it would cause Atlas to lose customers. These concerns

6

led McConnell to cheat on the agreement to some extent; she quoted prices as "picked up" instead of "delivered," even though Appellants had agreed that prices should be quoted as "delivered." McConnell explained, "I quoted the number that was agreed upon, but I quoted it picked up, which gave me the advantage." Weil discovered that McConnell was cheating, and he complained to Anthony, Jr., who in turn asked McConnell if she was following the agreement. She "basically lied to him" and said she was.

On November 23, 1992, Anthony, Jr., Anthony, Sr., David, Weil, and Kovinsky met at a steakhouse in Hialeah, Florida. Kovinsky testified that at this meeting, the Giordanos accused Weil of cheating on the Sea Ranch Agreement. After the meeting, the Giordanos told McConnell they thought Weil was cheating on the Sea Ranch Agreement. Atlas-Miami River was having trouble purchasing the scrap it needed, and Anthony, Jr. instructed McConnell to raise prices to two large scrap dealers in order to regain their business. The Giordanos, however, were apparently not ready to abandon the Sea Ranch Agreement entirely, because they would not allow McConnell to raise her prices to other suppliers. Sunshine and Atlas pricing documents established that some of their prices followed the Sea Ranch Agreement until at least December 31, 1992.

## II. DISCUSSION

### A. Jurisdiction

Appellants argue that the indictment failed to plead and the Government failed to prove the jurisdictional element of the Sherman Act. This jurisdictional element may be pleaded and proven under either of the following two theories: (1) the offending activities took place in the flow of interstate commerce (flow theory); or (2) the defendants' general business activities had or were likely to have a substantial effect on interstate commerce (effects theory). *United States v. Fitapelli*, 786 F.2d 1461, 1462 (11th Cir. 1986).

In this case, the jury was charged under both the flow theory and the effects theory. We must therefore first examine the indictment to determine whether both theories have been sufficiently pleaded.[4] If we conclude the indictment properly pleaded both theories, we must then examine whether the Government sufficiently proved either theory at trial. *See id.* at 1463-64.

Looking first at the issue of proper pleading, Appellants claim the indictment failed to plead the flow theory. The flow theory focuses directly on the

---

[4]If the indictment failed to properly plead both the flow theory and the effects theory, it would be fatally defective because the district court, in instructing the jury on both theories, would have "instructed the jury on a theory of jurisdiction which had not been charged by the grand jury," destroying Appellants' "right to be tried only on the charges against them." *Fitapelli*, 786 F.2d at 1463-64.

challenged anti-competitive conduct, rather than on the defendants' general business activities. *See id.* at 1462. Appellants argue that the indictment in this case was fatally defective because it alleged only that Appellants' general business activities, not specifically the anti-competitive activities at issue in this case, were within the flow of interstate commerce. The indictment contains the following language:

> The business activities of the defendants and co-conspirators *that are the subject of this Indictment* were within the flow of, and substantially affected, interstate and foreign trade and commerce.

(emphasis added).

By stating that the business activities "that are the subject of this Indictment were within the flow of, and substantially affected, interstate and foreign trade and commerce,"[5] the indictment sufficiently alleged jurisdiction under both the flow theory and the effects theory.[6] The phrase "the business activities . . . that are the

---

[5] We note that this sentence is grammatically awkward, as it is not immediately clear whether the phrase "that are the subject of this Indictment" modifies "business activities" or "defendants and co-conspirators." Upon further examination, however, it becomes clear that the phrase cannot modify "defendants and co-conspirators." The word "defendants" refers to all parties who are "the subject of this Indictment." The word "co-conspirators" must then refer to unindicted co-conspirators (such as McConnell and Kovinsky). The phrase in question must therefore modify "business activities."

[6] Appellants also argue that the indictment failed to plead the effects theory. They concede that under the effects theory, this circuit requires only that the defendant's general business activities, not the specific anti-competitive conduct in question, have a substantial effect on interstate commerce. *See Shahawy v. Harrison*, 778 F.2d 636, 640 (11th Cir. 1985). Appellants argue, however, that *Shahawy* was wrongly decided and is likely to be overturned by

subject of" the indictment refers to the specific anti-competitive conduct challenged in the indictment, not merely to Appellants' general business activities.

Appellants also argue the Government failed to prove either jurisdictional theory at trial.[7] We conclude the Government proved jurisdiction under the effects theory. The record reveals that scrap metal subject to Appellants' price-fixing agreement was exported to India and Korea and was shipped interstate to Alabama, Georgia, and Indiana. Furthermore, Sunshine directed a shipment of auto scrap from the Bahamas to Atlas pursuant to the agreement. "As a matter of practical economics, a substantial relationship with interstate markets has been established and, therefore, jurisdiction has been proven under the effect[s] theory." *Fitapelli*, 786 F.2d at 1465. Having concluded that jurisdiction was proven under the effects theory, we need not address whether it was proven under the flow theory. *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 679, 680 n.2 (5th Cir. Unit B 1981).[8]

---

this Court sitting *en banc* or by the Supreme Court. As we are bound by circuit precedent, we will not address this argument here, but we will note that even under Appellants' argument, the indictment properly pleads the effects theory for the same reason it properly pleads the flow theory.

[7]Appellants claim the Government relied exclusively on the flow theory at trial, but failed to prove it. According to Appellants, the fact that Atlas and Sunshine exported processed scrap did not satisfy the Government's burden of proof under the flow theory.

[8]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior

B. <u>Sufficiency of the Evidence</u>

Appellant Weil challenges the sufficiency of the evidence to support his conviction. According to Weil, the evidence showed at most that he intended to use his superior knowledge of the scrap metal market to take advantage of the pricing information collected from Atlas. Weil claims he only intended to "play along" with Atlas and use the Atlas pricing information to his own advantage; he intended to unilaterally set Sunshine's prices based on his knowledge of the market and his knowledge of Atlas' prices.

Whether the evidence is sufficient to support Weil's conviction is a question of law subject to de novo review. *United States v. Majors*, 196 F.3d 1206, 1210 (11th Cir. 1999), *cert. denied*, 529 U.S. 1137, 120 S. Ct. 2022 (2000). In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the Government, making all inferences and credibility choices in the Government's favor. *Id.* We must affirm the conviction if a reasonable fact-finder could have concluded Weil was guilty beyond a reasonable doubt. *Id.*

Viewing the evidence in the light most favorable to the Government, the evidence is sufficient to sustain Weil's conviction. McConnell and Kovinsky testified that Weil attended the Sea Ranch meeting, where Appellants agreed to

---

to close of business on September 30, 1981.

specific prices for various grades of scrap. According to the testimony, Weil dictated the prices, and McConnell copied them into her notebook. Weil contacted Anthony, Jr. on at least one occasion to complain that McConnell was cheating on the Sea Ranch agreement. In addition, Weil agreed to send Atlas the shipment of cars from the Bahamas in exchange for Anthony, Jr.'s promise to keep McConnell away from the car dealerships located near Sunshine. Furthermore, Weil originally objected to McConnell's attendance at the Sea Ranch meeting because she was not a principal of Atlas or Sunshine. This objection suggests that Weil knew and understood that the meeting was illegal. This evidence is sufficient to sustain Weil's conviction.

## C. Rule 404(b) Evidence

Appellants argue that certain evidence admitted pursuant to Fed. R. Evid. 404(b) and relating to an earlier price-fixing conspiracy involving Atlas in Cleveland became a dominant feature of the trial, and they contend their convictions are based on the Rule 404(b) evidence rather than on the evidence relating to this case.[9] In this circuit, there is a three-part test for evaluating the admissibility of evidence of uncharged misconduct under Rule 404(b). *United*

---

[9]"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." Fed. R. Evid. 404(b).

12

*States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc). "First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403." *Id.* (footnote and internal citations omitted); *see also Huddleston v. United States*, 485 U.S. 681, 689, 108 S. Ct. 1496, 1501 (1988); *United States v. Beechum*, 582 F.2d 898, 910-11 (5th Cir. 1978) (en banc).

We review the district court's decisions on the admissibility of evidence of uncharged misconduct under Rule 404(b) for abuse of discretion. *United States v. Calderon*, 127 F.3d 1314, 1331 (11th Cir. 1997). After conducting an extensive review of the record, we conclude the district court did not abuse its discretion in admitting the evidence in question.

The Government introduced evidence of a Cleveland price-fixing conspiracy involving Atlas. Appellants complain that the Cleveland evidence became the focus of the trial and that the jury was allowed to consider the Cleveland evidence against all defendants, even though it only applied to some of them. McConnell testified about several Cleveland incidents involving Atlas and Anthony, Jr., and

13

Benedetto Tripodo testified about an incident involving Atlas and Anthony, Sr.[10] The district court allowed this evidence as proof of intent and lack of mistake under Rule 404(b). We will first address the arguments of Atlas, Anthony, Jr., and Anthony, Sr. regarding the Rule 404(b) evidence of uncharged misconduct in which they were involved. We will next address the separate arguments of David, Weil, and Anthony, Sr. regarding the Rule 404(b) evidence of uncharged misconduct in which they were not involved.

Anthony, Jr. and Anthony, Sr. argue that the Rule 404(b) evidence was such a focal point of the trial that there is a substantial danger that they were convicted on the basis of the Cleveland events instead of on the basis of the south Florida events. They argue that the pricing information was exchanged during joint venture negotiations, and that they did not intend to fix prices. The evidence that Anthony, Jr. and Anthony, Sr. had engaged in price-fixing conduct on behalf of Atlas, when added to the evidence that there was no joint venture in south Florida and the evidence that prices in fact decreased in the manner prescribed by the agreement, strongly suggests that Atlas, Anthony, Jr., and Anthony, Sr. had the

---

[10]Tripodo, who worked for a competitor of Atlas in Cleveland, testified that he attended a meeting at which both Anthony, Jr. and Anthony, Sr. were present. Tripodo claimed Anthony, Sr. stated that he had an "understanding" with Tripodo's employer under which Tripodo should "stay away" from scrap accounts that belonged to Atlas. **[R20 at 1430-32]** Tripodo did not recall any specific comments made by Anthony, Jr. **[Id.]**

14

intent to fix prices. The district court therefore did not abuse its discretion under the first prong of the *Miller* test. Given the strong probative value as to intent, we conclude under the third prong that the probative value of the 404(b) evidence was not substantially outweighed by undue prejudice to these three Appellants, to the extent that the district court admitted evidence of uncharged misconduct in which they were involved. As to the second prong, we agree with the district court that there was ample evidence that the Cleveland price-fixing activities actually occurred.

David and Weil complain most loudly about the Rule 404(b) evidence, arguing that they were not involved in any of the Cleveland incidents. Anthony, Sr. also complains about the admission of McConnell's testimony involving only Atlas and Anthony, Jr. These Appellants contend the jury was not sufficiently cautioned that it could consider the evidence of the Cleveland activities against only the defendants who were involved in the activities. These Appellants are correct that the Rule 404(b) evidence relating to uncharged misconduct in which they did not participate should not have been considered against them. They are incorrect, however, in asserting that the jury was not sufficiently aware of this fact. The district court cautioned the jury as to the proper use of the Rule 404(b) evidence on several occasions. The district court told the jury that "with respect to

the evidence elicited from Mr. Tripodo, you can't consider that evidence with respect to Mr. Weil, David Giordano or Tony Giordano, Junior." As for McConnell's testimony regarding the Cleveland activities, the court gave the following instruction:[11]

> During the course of the trial, as you know from instructions I gave you then, you heard evidence of acts of a defendant which may be similar to those charged in the indictment, but which were committed on other occasions.

> You must not consider any of this evidence in deciding if a defendant committed the acts charged in the indictment. However, you may consider this evidence for other very limited purposes.

> If you find beyond a reasonable doubt from other evidence in this case that a defendant did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine whether a defendant had the state of mind or intent necessary to commit the crime charged in the indictment, whether the defendant acted according to a plan or in preparation for commission of a plan, or whether a defendant committed the acts for which the defendant is on trial by innocence or mistake.

> The case of each defendant and the evidence pertaining to each defendant should be considered separately and individually. The fact that you may find any one of the defendants guilty or not guilty should not affect your verdict as to any other defendant.

> I caution you, members of the jury, that you are here to determine from the evidence in this case whether each defendant is guilty or not guilty. Each defendant is on trial only for the specific

[11]The court also gave a similar instruction during McConnell's testimony.

16

offense charged, alleged in the indictment.

We cannot say the district court abused its discretion in declining to mention each Appellant individually and detail which evidence applied to him. The above instruction was sufficient to alert the jury that it was to consider the Rule 404(b) evidence only in relation to those Appellants who were involved in the specific Cleveland activities that the testimony concerned.

D.  Reasonableness of the Price-Fixing Agreement

Appellants claim the district court erred in not requiring the Government to prove that the price-fixing agreement was unreasonable. According to Appellants, the Sea Ranch meeting was necessary because McConnell had unilaterally created a "price war" that was "driving both companies out of business." Atlas Br. at 58-59. Appellants claim they met to discuss lowering prices back to competitive levels or negotiating a merger or joint venture. In other words, their argument is that this price-fixing agreement was reasonable because it was meant "to restore competition, not to eliminate it." *Id.* at 59.

The Sherman Act makes illegal "[e]very contract, combination . . . or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has stated that this language is limited by the "rule of reason." *Standard Oil Co. v. United States*, 221 U.S. 1, 61-62, 31 S. Ct. 502, 516 (1911). The Court has also

stated, however, that some types of conduct, including price-fixing, are so manifestly anticompetitive that proof of unreasonableness in each case is not required:

> Although the Sherman Act, by its terms, prohibits every agreement "in restraint of trade," this Court has long recognized that Congress intended to outlaw only unreasonable restraints. As a consequence, most antitrust claims are analyzed under a "rule of reason," according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.
>
> Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*. *Per se* treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.

*State Oil Co. v. Kahn*, 522 U.S. 3, 10, 118 S. Ct. 275, 279 (1997) (internal citations, alteration, and quotation marks omitted).

The district court followed the long-established rule that a horizontal price-fixing agreement, such as the one involved in this case, is *per se* illegal. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S. Ct. 811, 842 (1940) ("[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which

18

those agreements were designed to eliminate or alleviate may be interposed as a defense").

In *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S. Ct. 2864 (1978), the Supreme Court made the following statement:

> [A] defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken by the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices.

*Id.* at 435, 98 S. Ct. at 2872 (citing *Morissette v. United States*, 342 U.S. 246, 274-75, 72 S. Ct. 240, 255).

*Gypsum* was a rule of reason case. The issue was whether the defendants' exchange of pricing information for purposes of compliance with the Robinson-Patman Act, 15 U.S.C. § 13, violated the Sherman Act. The defendants had not agreed to fix prices; they had exchanged information on current and past prices, but they had not exchanged information regarding future prices. The district court had instructed the jury that "if the effect of the exchanges of pricing information was to raise, fix, maintain, and stabilize prices, then the parties to them are presumed, as a matter of law, to have intended that result." *Id.* at 430, 98 S. Ct. at 2869. Exchange of pricing information is analyzed under the rule of reason. *Id.* at 441 n.16, 98 S. Ct. at 2875 n.16. The Court therefore "concluded that intent is a

19

necessary element of a criminal antitrust violation." *Id.* at 443, 98 S. Ct. at 2876.

This holding inspired several antitrust defendants in price-fixing cases to mount unsuccessful challenges to the *per se* rule that was applied to them. *See, e.g., United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 683 (5th Cir. Unit B. 1981); *United States v. Gillen*, 599 F.2d 541, 545 (3d Cir. 1979); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979). In *Cargo Service Stations*, the former Fifth concluded that *Gypsum* did not change *Socony-Vacuum*'s rule that price fixing is *per se* illegal: "[P]rice fixing is an unreasonable restraint prohibited by the antitrust laws. . . . [I]t follows that if price fixing is inevitably an unreasonable restraint of trade, the intent to fix prices is equivalent to the intent to unreasonably restrain trade."[12] 657 F.2d at 683; *see also Gillen*, 599 F.2d at 545; *Brighton*, 598 F.2d at 1106. The intent requirement was met in those cases because "the district court equated the intent to fix prices with the requisite intent to unreasonably restrain commerce." *Cargo Serv. Stations*, 657 F.2d at 683. The situation was therefore unlike that in *Gypsum*, in which the district court had equated the effect of the exchange of pricing information with the intent to fix prices.

Appellants argue that *Cargo Service Stations* is no longer good law "in light

---

[12]*Cargo Service Stations* is binding precedent for this Court. *See supra* note 8.

20

of the Supreme Court's evolving due process jurisprudence since 1940." Atlas Br. at 61-62, citing *United States v. Gaudin*, 515 U.S. 506, 115 S. Ct. 2310 (1995). Specifically, Appellants argue that the *per se* rule should not be applied in criminal cases because it creates an unconstitutional presumption in violation of the Supreme Court's decision in *Francis v. Franklin*, 471 U.S. 307, 313, 105 S. Ct. 1965, 1970 (1985) ("The Due Process Clause of the Fourteenth Amendment . . . prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime.").

Appellants' argument in effect asks us to overrule *Socony-Vacuum*. Like other circuits that have been asked to overrule *Socony-Vacuum*, we decline to do so. *See, e.g., United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195-96 (3d Cir. 1985); *United States v. Koppers Co.*, 652 F.2d 290, 293 (2d Cir. 1981); *United States v. Mfrs'. Ass'n of the Relocatable Bldg. Indus.*, 462 F.2d 49, 51 (9th Cir. 1972). Appellants' reliance on *Franklin*'s rule that mandatory presumptions are unconstitutional in criminal cases is misplaced. In *Franklin*, the Court held unconstitutional a jury instruction that established a rebuttable presumption of intent from proof of other elements of the crime. *Franklin*, 471 U.S. at 315-16; 105 S. Ct. at 1971-72 ("The portion of the jury charge challenged in this case

21

directs the jury to presume an essential element of the offense--intent to kill--upon proof of other elements of the offense--the act of slaying another."); *see also Morissette v. United States*, 342 U.S. 246, 274, 72 S. Ct. 240, 255 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. ").

Here, the jury was instructed that in order to return guilty verdicts it had to find that Appellants "knowingly joined a conspiracy to fix prices or allocate customers." The jury was therefore instructed that it must find that Appellants intended to fix prices. "[T]he Sherman Act does not make 'unreasonableness' part of the offense," so "it cannot be said that the judicially-created *per se* mechanism relieves the Government of its duty of proving each element of a criminal offense under the Act." *Koppers*, 652 F.2d at 294. In other words, " 'unreasonableness' is an element of the crime only when no *per se* violation has occurred." *Mfrs'. Ass'n*, 462 F.2d at 52. Against this background, it becomes clear that "[t]he *per se* rule does not establish a presumption. It is not even a rule of evidence." *Id.*; *see also Brighton*, 598 F.2d at 1106 ("Since the *per se* rules define types of restraints that are illegal without further inquiry into the competitive reasonableness, they are substantive rules of law, not evidentiary presumptions. It is as if the Sherman Act read: 'An agreement among competitors to [fix prices] is illegal.' ") (internal

quotation marks omitted).

E.  Sentencing Guidelines

Appellants claim the district court erred in applying U.S.S.G. § 2R1.1, the Antitrust Guideline.  The 1999 version of the Antitrust Guideline, applicable to this case, establishes a base offense level of 10, and it provides for an enhancement based upon "the volume of commerce attributable to the defendant."  U.S.S.G. § 2R1.1(b)(2).  If the amount of commerce affected is between $400,000 and $1,000,000, then the base offense level is increased by one.  *Id.*  The Guideline states that "the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him or his principal in goods or services that were affected by the violation."  U.S.S.G. § 2R1.1(b)(2).

The district court applied this guideline and, accepting the Government's submissions of the volume of commerce affected to be $636,153.66 for Atlas and $839,043.80 for Sunshine, increased Appellants' offense levels by one.  We review the district court's findings of fact for clear error and its application of the Sentencing Guidelines to those facts de novo.  *United States v. Trujillo*, 146 F.3d 838, 847 (11th Cir. 1998).

Appellants claim the volume of commerce affected by the violation was well under $400,000.  At trial, Appellants relied on *United States v. SKW Metals &*

*Alloys, Inc.*, 4 F. Supp. 2d 166 (W.D.N.Y. 1997) (*SKW I*), which defined the "volume of commerce" to include only sales that were made at the targeted price. *Id.* at 171-72. The district court instead followed the Sixth Circuit's decision in *United States v. Hayter Oil Co.*, 51 F.3d 1265 (6th Cir. 1995), which defined the volume of commerce to include "all sales of the specific types of goods or services which were made by the defendant or his principal during the period of the conspiracy, without regard to whether individual sales were made at the target price." *Id.* at 1273. The Second Circuit later vacated the sentences imposed by the district court in *SKW I*, *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 89-92, 93 (2d Cir. 1999) (*SKW II*), but Appellants argue the Second Circuit's approach is still more favorable to them than the approach the district court used here.

The Sixth Circuit in *Hayter Oil* reasoned that "[i]t would be an anomaly to declare price-fixing illegal per se, without regard to its success, . . . but to provide for a fine only if the price-fixing were successful." 51 F.3d at 1274. In *SKW II*, the Second Circuit declined to fully embrace the Sixth Circuit's approach, finding it unnecessary to the goal of deterrence to adopt the "tenuous presumption that commerce is affected by all sales within the period set forth in the indictment

24

regardless of what effects, if any, the conspiracy may have had." *Id.* at 92.[13]

Instead, the court reasoned that "[i]f the conspiracy was a non-starter, or if during the course of the conspiracy there were intervals when the illegal agreement was ineffectual and had no effect or influence on prices, then sales in those intervals are not 'affected by' the illegal agreement, and should be excluded from the volume of commerce calculation." *Id.* at 91.

Appellants appear to advocate an approach similar to that taken by the district court in *SKW I*, which would include in "volume of commerce" only those sales "for which the conspirators successfully achieved their illegally-fixed target price." *SKW I*, 4 F. Supp. 2d. at 172. The Government advocates the approach taken by the Sixth Circuit in *Hayter Oil*, but notes that the Second Circuit's approach in *SKW II* would reach the same result in this case.

We agree with the Second Circuit that "a conspiracy warranting conviction can exist even if, for sentencing purposes, it does not succeed in affecting prices throughout the entire period of the conspiracy, or at all." *SKW II*, 195 F.3d at 90. In such a case, the conspiracy would have no effect on commerce. The Second

---

[13]The Second Circuit also noted that individual defendants are subject to a mandatory minimum fine of $20,000. *SKW II*, 195 F.3d at 92 (citing U.S.S.G. 2R1.1 (c)) (1990).

Circuit's approach does not differ radically from the Sixth Circuit's approach.[14]

*SKW II* does not limit the volume of commerce affected to the sales made at the target price, the approach Appellants advocate.  Instead, the Second Circuit explicitly noted that "a price-fixing conspiracy can affect prices even when it falls short of achieving the conspirators' target price."  195 F.3d at 89-90.  In discussing the requirement of an "effect" on commerce, the *SKW II* court made the following statement:

> [T]he verb "to affect" expresses a broad and open-ended range of influences.  We therefore conclude that a conspiracy need not achieve its specific goals or targets in order to affect commerce for sentencing purposes.  Sales can be "affected" by a conspiracy when the conspiracy merely acts upon or influences negotiations, sale prices, the volume of goods sold, or other transactional terms.  While a price-fixing conspiracy is operating and has *any* influence on sales, it is reasonable to conclude that all sales made by defendants during that period are "affected" by the conspiracy.

*SKW II*, 195 F.3d at 90 (internal citations omitted).  We agree that this statement accurately reflects the purpose of the Antitrust Guidelines.

We emphasize that this approach does not require a "sale-by-sale accounting."  In *Hayter Oil*, the Sixth Circuit relied on the *per se* rule applicable to price-fixing cases and the fact that it "avoids the necessity of making 'a

---

[14]The Second Circuit stated, "The Sixth Circuit in *Hayter Oil* ruled that the volume of commerce is calculated 'without regard to whether individual sales were made at the target price.' *That ruling is generally in accordance with the analysis we adopt*."  *SKW II*, 195 F.3d at 91 (emphasis added) (internal citation omitted).

burdensome inquiry into actual market conditions' to determine when the conspiracy 'involves anticompetitive conduct.' " 51 F.3d at 1273 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-16 & n. 25, 104 S. Ct. 1551, 1559-60 & n. 25 (1984)). We agree with the Sixth Circuit that the district court should not undertake a "burdensome inquiry" into the volume of commerce for sentencing purposes. It is enough for the district court to determine the periods during which the conspiracy was effective. Once the conspiracy is found to have been effective during a certain period, there arises a rebuttable presumption that all sales during that period were "affected by" the conspiracy.[15] *See United States v. Andreas*, 216 F.3d 645, 678 (7th Cir. 2000). The defendant may rebut that presumption by offering evidence that certain sales, even though made during a

---

[15]This approach differs slightly from the approach taken by the majority in *SKW II*. The majority there also noted that "a sale-by-sale accounting is not required," and stated that in making the volume of commerce determination, "[a] court may consider the goals of the conspiracy and the steps taken to implement it, the market share of the conspirators, and the perceptions of the conspirators and the persons with whom they transacted business, and may otherwise deduce the effect on commerce from the pressures brought to bear on it." 195 F.3d at 91. We believe these factors are largely irrelevant to determining a conspiracy's effect on commerce. *See id.* at 94 (Newman, J., concurring). We do agree with the *SKW II* majority, however, that the Government must "prove that the prices charged were 'affected by' the conspiracy." 195 F.3d at 91. To prove that prices were "affected by" the conspiracy, the Government must show that the conspiracy was effective to some extent (i.e. was not a non-starter and was not completely ineffective for periods of time). Once the Government has shown that the conspiracy was effective to at least some extent during a certain period, there arises a rebuttable presumption that all prices during that period were "affected by" the conspiracy. The defendant may rebut the presumption by showing that certain sales were unaffected by the conspiracy. *See id.* at 94 (Newman, J., concurring).

27

period when the conspiracy was effective, were not affected by the conspiracy.[16]

*See SKW II*, 195 F.3d at 93 (Newman, J., concurring) (Evidence of an unaffected transaction "would be peculiarly within the knowledge of the defendant," so "it is entirely appropriate to oblige him to prove it, or at least come forward with evidence of it"); *see also Andreas*, 216 F.3d at 679. When a conspiracy is a non-starter, however, or when the illegal agreement is ineffectual during a certain time period, those sales should not be included in the volume of commerce, because they were not "affected by" the illegal agreement. *SKW II*, 195 F.3d at 91; *see also Andreas*, 216 F.3d at 677 ("Like the Second Circuit, we disagree with the *Hayter Oil* holding in so far as it implies that all sales during the time period of the price-fixing conspiracy should be counted for purposes of § 2R1.1 simply because they occurred during the period of the conspiracy.").

Appellants argue this conspiracy was a non-starter, which, if true, would require us to vacate their sentences. The district court based its volume of commerce calculation on sales during the period between October 24, 1992, and

---

[16]We recognize there may be a "rare instance" where, "under unusual circumstances, a seller quotes or agrees to a price without any reference to the fixed price," even during a period when a price-fixing conspiracy is otherwise effective. *Id.* at 93 (Newman, J., concurring) (noting that a defendant may agree to sell to his brother-in-law without reference to the illegally fixed price). If a defendant comes forward with evidence that a particular sale was uninfluenced by the illegal agreement, even though that sale occurred during a period when the agreement was otherwise effective, that sale should not be counted in the volume of commerce affected by the illegal agreement. *Id.* at 93-94 (Newman, J., concurring).

December 31, 1992.  There is ample evidence that the conspiracy was effective during this period.  The Government presented detailed pricing summaries showing that Appellants' sales during this period were consistently at or near the prices agreed upon at Sea Ranch.   In the face of the extensive evidence of pricing consistent with the Sea Ranch agreement, Appellants' argument that this conspiracy was a non-starter is without merit.[17]   In addition, there is no evidence that the conspiracy was ineffective for any period of time between October 24, 1992, and December 31, 1992, and there is no evidence that any particular sales were unaffected by the illegal agreement.[18]  We therefore conclude the district

---

[17]McConnell did testify that she cheated on the conspiracy by using the Agreement's "delivered" prices but quoting them as "picked up."  The fact that she did not completely abide by the illegal agreement does not, however, mean that the conspiracy was a non-starter.  Since she was using the agreed-upon "delivered" prices, her prices were influenced by the agreement.  This situation simply reflects classic "cheating" on a price-fixing agreement.  *See, e.g., SKW II*, 195 F.3d at 94 (Newman, J., concurring):

> Once a seller agrees to fix prices, he either sells at that price or (unless he is both a price-fixer and an amnesiac) at least has the fixed price in mind and uses it as a point of departure for himself in deciding what slightly different price to quote for almost every sale he makes during the period of the conspiracy.  *As long as the seller has the fixed price in mind when he decides by how much to depart from it when quoting a price, his final sale price has been affected by the price-fixing agreement.*

*Id.*  (Newman, J., concurring) (emphasis added).

[18]Appellants had a meeting on November 23, 1992, at which the Giordanos accused Weil of cheating on the agreement.  Appellants argue that after this meeting, some of the prices they charged were not affected by the agreement.  The Atlas Appellants claim that after the meeting, they were simply trying to do everything they could to obtain scrap, including adjusting their prices.  Even if they adjusted some of their prices to levels above those dictated by the Sea Ranch agreement, there is no evidence that the prices were not at least *influenced* by the Sea Ranch agreement.  *See supra* note 17.  In fact, the extensive evidence of pricing introduced by

court did not err in including in the volume of commerce affected all sales of the affected products between October 24, 1992, and December 31, 1992. Accordingly, we affirm the district court's one-level enhancement of Appellants' sentences based on the fact that the volume of commerce affected by their conspiracy was greater than $400,000.[19]

## III. CONCLUSION

For the foregoing reasons, the convictions and sentences of all Appellants are affirmed.

AFFIRMED.

the Government shows that most sales through December were at the Sea Ranch levels. Furthermore, there was no testimony that Appellants explicitly repudiated the conspiracy at the November 23, 1992, meeting. The district court therefore did not err in including these sales in the volume of commerce affected.

[19]Appellant Weil also argues that the district court erred in enhancing his sentence by two levels for his role in the offense, pursuant to U.S.S.G. § 3B1.1(c). The district court also imposed the same enhancement on the Giordanos, who do not appeal the imposition of the two-level enhancement. The district court found that each of these Appellants played an important role in organizing and directing the activities of the conspiracy. We conclude the district court did not err in imposing the two-level enhancement on Weil.